The CITY AND COUNTY OF DENVER, a municipal corporation of the State of Colorado, Plaintiff,

v.

CONTINENTAL AIR LINES, INC. a Delaware corporation, and United Air Lines, Inc., a Delaware corporation, Defendants.

Civ. A. No. 88–M–1391.

United States District Court, D. Colorado.

May 8, 1989.

B. Lawrence Theis, Bobbie J. Musgrave, Walters & Theis, Stephen H. Kaplan, Patricia L. Wells, City Attorney's Office, Denver, Colo., for plaintiff.

Frances A. Koncilja, Peter C. Forbes, Morrison & Foerster, Denver, Colo., Harold J. McElhinny, Morrison & Foerster, San Francisco, Cal., for defendant Continental.

Andrew Petrie, Erich Bethke, Kirkland & Ellis, Denver, Colo., Stephen C. Neal, Kirkland & Ellis, Chicago, Ill., for defendant United.

Ron Olson, Charles Siner, Adams Co. Atty., Brighton, Colo., Perry Rosen, Paige Emmett Reffe, Washington, D.C., for Adams County.

William G. Pharo, Asst. U.S. Atty., Denver, Colo., Sandra M. Schraibman, Merril Hirsh, Atty., Dept. of Justice, Washington, D.C., for the U.S. (amicus brief).

## MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

The plaintiff, the City and County of Denver (Denver), is the owner and operator of Stapleton International Airport (Stapleton) in Denver, Colorado. The defendants, Continental Air Lines, Inc. (Continental) and United Air Lines, Inc. (United), are commercial airlines using Stapleton for air commerce pursuant to lease agreements entered into in 1968 and set to expire in 1993. These lease agreements permit United and Continental (the airlines) to land and take off from Stapleton's airfield and to use certain concourse and terminal space for their operations. The leases provide that Denver can determine the rentals, fees and charges for the airlines' use of Stapleton provided that the amounts are "reasonable in relation to the costs of providing, operating and maintaining the particular service or facility."

For many years Denver has determined those costs by dividing Stapleton into three primary cost centers: (1) the terminal area, composed of the main terminal and concourses; (2) the field area, consisting primarily of runways and taxiways, and (3) the public area, including parking lots and ground transportation facilities. Under this cost accounting method, Denver has assigned costs of the terminal area in determining airline terminal rental rates and has allocated costs attributable to the field area in charging landing fees to the airlines.

Denver also obtains income at Stapleton from non-airline tenants. Non-airline revenues, known as "concession revenues," are derived from contracts and leases with the operators of restaurants, gift shops, rental car outlets, and parking lots in the public area and terminal area at Stapleton. These concession revenues exceed the costs attributed by Denver for the provision and use of the facilities creating a surplus that has accumulated in a special fund, the Stapleton Capital Improvement and Replacement Fund (Capital Fund). Historically the Capital Fund has been used for capital expenditures and extraordinary maintenance costs at Stapleton.

Denver has decided to replace Stapleton with an entirely new airport to be constructed on a different site. To help finance the replacement airport, Denver is drawing on the Capital Fund. In addition, Denver has also included certain land development and financing costs for the proposed replacement airport in the terminal rental rates and landing fees currently

charged to the airlines. By way of example, on January 1, 1989 Denver imposed a 96% increase in Continental's landing fees over and above the 1988 charges. A large part of that increase is intended for the payment of the debt service charges on bonds issued to purchase the land site for the replacement airport.

Thus, Denver plans to replace Stapleton with a new airport and finance it, in part, from charges to concessionaires and airlines using Stapleton. Denver brought this civil action seeking a declaratory judgment that this financing plan does not violate the prohibitions of the Federal Anti–Head Tax Act, 49 U.S.C.App. § 1513. The airlines have counterclaimed asserting that the financing plan is prohibited by that federal statute and is a breach of the existing lease agreements. Continental also claims that Denver has violated the United States Constitution. Cross-claims for summary judgment have been filed and because of the public importance of the dispute, this court has expedited consideration of two questions included among the issues raised by the pleadings and these motions.

> 1. Does the Federal Anti–Head Tax Act prohibit Denver from using the Capital Fund for costs connected with the proposed new airport?
>
> 2. Does the Federal Anti–Head Tax Act prohibit Denver from recovering costs connected with the proposed new airport in the current rental rates, fees and charges assessed to the defendant airlines at Stapleton?

After examining the plain language of the Anti–Head Tax Act as well as its legislative history and the relevant case law, this court concludes that Denver is not prohibited from using the Capital Fund for costs connected with the new airport, and that Denver is prohibited from recovering costs connected with the proposed new airport in the current rental rates, fees and charges assessed to the defendant airlines at Stapleton.

In answering these questions, the parties have agreed that this court should assume that the airlines' ticket prices will reflect the increases in the rates, rentals, fees and charges attributable to Denver's effort to finance the proposed new airport. Therefore, the airlines represent their passengers in this challenge to these charges collected from persons traveling in air commerce. The first question is ripe for determination in this action, even though none of the concessionaires is a party, because the airlines challenge Denver's cost accounting methodology by claiming that all costs and revenues from Stapleton must be considered together in determining reasonable costs for the airlines' use of the airport. Thus, the airlines contend that the concessionaire revenues should not be considered separately and that all expenditures from the Capital Fund must be for the benefit of Stapleton.

■ The Anti–Head Tax Act, found at 49 U.S.C.App. § 1513, provides, in pertinent part:

(a) *Prohibition;* ....

No State (or political subdivision thereof ...) shall levy or collect a tax, fee, head charge, or other charge, directly or indirectly, on persons traveling in air commerce or on the carriage of persons traveling in air commerce or on the sale of air transportation or on the gross receipts derived therefrom; ...

(b) *Permissible State taxes and fees.*

[N]othing in this section shall prohibit a State (or political subdivision thereof ...) owning or operating an airport from levying or collecting reasonable rental charges, landing fees, and other service charges from aircraft operators for the use of airport facilities.

In any case involving the interpretation of a statute, the court's analysis must always begin with the language of the statute itself. *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985). Section (a) is a general prohibition of taxes, fees, and charges affecting persons traveling in air commerce, and section (b) grants permission for airport owners to impose reasonable charges for the use of the airport facilities they provide.

Read literally, the Anti–Head Tax Act has no application to the concession reve-

nues at Stapleton. The statute prohibits charges to persons traveling or being carried in "air commerce" and on the sale of "air transportation." "Air commerce" is defined as "interstate, overseas, or foreign air commerce or the transportation of mail *by aircraft* or any operation or navigation *of aircraft* within the limits of any Federal airway or any operation or navigation *of aircraft* which directly affects, or which may endanger safety in, interstate, overseas, or foreign air commerce." 49 U.S.C. App. § 1301(4) (emphasis added). "Air transportation" means "interstate, overseas or foreign air transportation or the transportation of mail *by aircraft.*" 49 U.S.C.App. § 1301(10) (emphasis added). These definitions limit the reach of the Anti–Head Tax Act. Section 1513(a) was intended to protect passengers transported *by aircraft. Salem Transp. Co. v. Port Auth.,* 611 F.Supp. 254 (S.D.N.Y.1985) (Section 1513(a) of the Anti–Head Tax Act does not apply to ground transportation services used by airline passengers at New York metropolitan airports); *see also Airline Car Rental, Inc. v. Shreveport Airport Auth.,* 667 F.Supp. 293 (W.D.La.1986) (Section 1513 was not meant to apply to shuttle services provided by non-tenant rental car agency used by airline passengers); *State v. Cochise Airlines,* 128 Ariz. 432, 626 P.2d 596 (Ariz.Ct.App.1980) (Arizona transaction privilege tax, to the extent it imposes a tax on the transportation of freight and not persons in air commerce, does not violate the Anti–Head Tax Act).

The legislative history of the Anti–Head Tax Act reinforces this court's conclusion that Congress did not intend it as a restriction on the collection and use of concession revenues. Nowhere in the legislative history of the Anti–Head Tax Act is there any indication that Congress intended to regulate rates charged to concessionaires, and there is no indication that Congress sought to preclude airport operators from generating surplus revenues from concessionaires to fund airport expansion and development. On the contrary, Congress recognized concession revenues as an important source of airport capital funding since federal government grant money does not finance 100% of any "airport development project." S.Rep. No. 93–12, 93d Cong., 1st Sess., *reprinted in* 1973 U.S.Code Cong. & Admin.News 1434, 1439–40; 119 Cong.Rec. 3352 (statement of Sen. Cannon); 49 U.S.C. App. § 2201 *et seq.; see also* S.Rep. No. 92–1005, 92d Cong., 2d Sess. 11–12 (1972) (Senate report of 1972 bill passed by Congress but pocket vetoed by President Nixon and almost identical to 1973 bill that became Anti–Head Tax Act).

The Anti–Head Tax Act was enacted in 1973. In 1970 Congress passed the Airport and Airway Development Act and the Airport and Airway Revenue Act to improve the national air transportation system. The 1970 acts created the Airport and Airway Trust Fund to accumulate and disburse federal funds to help finance local airport expansion and improvement projects. These federal funds were collected through various taxes upon air users, including an 8% tax on domestic airline tickets, a $3 head tax on international flights out of the United States, and a 5% tax on air freight. *See generally Massachusetts v. United States,* 435 U.S. 444, 98 S.Ct. 1153, 55 L.Ed.2d 403 (1978).

Two years later, in 1972 the Supreme Court held in *Evansville–Vanderburgh Airport Auth. Dist. v. Delta Airlines,* 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972) that neither the commerce clause nor the Airport and Airway Development Act precluded state or local authorities from assessing head taxes on air passengers boarding flights at state or local airports. The Court said:

No federal statute or specific congressional action or declaration evidences a congressional purpose to deny or preempt state and local power to levy charges designed to help defray the costs of airport construction and maintenance.

*Evansville,* 405 U.S. at 721, 92 S.Ct. at 1357. The enactment of the Anti–Head Tax Act in 1973 was a direct Congressional response to the *Evansville* decision. Concerned about the chaos, confusion, and resentment of local head taxes in light of the federal government's existing program to collect such charges from airline passen-

gers to fund the Airport and Airway Trust Fund, Congress determined that it would be an undue burden for airline passengers to be subject to double "user" taxes of that kind by state and local governments. S.Rep. No. 93–12, 93d Cong., 1st Sess., *reprinted in* 1973 U.S.Code Cong. & Admin.News 1434, 1446; 119 Cong.Rec. 3349–50 (1973) (statements of Sen. Cannon and Sen. Pearson, floor managers of Senate Bill 38 that eventually became Anti–Head Tax Act); *see generally Island Aviation, Inc. v. Guam Airport Auth.*, 562 F.Supp. 951 (D.Guam 1982). Thus, by the enactment of the Anti–Head Tax Act, Congress specifically pre-empted *user* taxes, fees and charges imposed by state and local governments on *air passengers in air commerce or air transportation,* and not taxes, fees and charges to other users of facilities provided by airport operators.

It should be noted that in *Evansville* the Supreme Court found it reasonable for state and local governments to distinguish passengers as a class from other airport users in analyzing whether the head charges in question violated the interstate commerce clause of the United States Constitution.

> [S]o long as the toll [charge] is based on *some fair approximation of use or privilege for use* ... and is neither discriminatory against interstate commerce nor excessive in comparison with the governmental benefit conferred, it will pass constitutional muster, even though some other formula might reflect more exactly the relative use of the state facilities by individual users.... *[T]hese charges reflect a fair, if imperfect, approximation of the use of facilities for whose benefit they are imposed.* We recognize that in imposing a fee on the boarding of commercial flights, both the Indiana and New Hampshire measures exempt in whole or part a majority of the actual number of persons who use facilities of the airports involved. Their number includes ... non-passenger users, such as persons delivering or receiving air-freight shipments, meeting or seeing off passengers, dining at airport restaurants, and working for employers located on airport grounds. Nevertheless these exceptions are not wholly unreasonable. *Certainly passengers as a class may be distinguished from other airport users, if only because the boarding of flights requires the use of runways and navigational facilities not occasioned by nonflight activities. Furthermore, business users, like shops, restaurants, and private parking concessions, do contribute to airport upkeep through rent, a cost that is passed on in part at least to their patrons.* (Emphasis added)

*Evansville,* 405 U.S. at 716–18, 92 S.Ct. at 1355–56. The distinction among various airport users at Stapleton, specifically between concessionaires and airlines, appears to be based upon a reasonable approximation of the relative uses of the facility and is wholly consistent with the principle in *Evansville* enunciated above. *See also American Trucking Association, Inc. v. Scheiner,* 483 U.S. 266, 107 S.Ct. 2829, 2843–44, 97 L.Ed.2d 226 (1987) (citing and quoting *Evansville* for the proposition that a flat tax or fee imposed by a state for the use of some public facility must approximate fairly the cost or value of the use of those facilities).

The airlines contend that their passengers should benefit from the surplus revenues accumulated in the Capital Fund because expenditures from the Capital Fund must be limited to uses at Stapleton, thereby lowering the cost components employed to develop terminal rental rates and landing fees. There is no support for this contention in the language of the statute or in the legislative history.

Persons affected by the rates, rentals and charges for the restaurants, gift shops, parking lots and rental cars, include persons who are not air passengers. These accessory uses of the airport may be considered amenities for air passengers and convenient for them, but no person traveling to, from or through Stapleton on United or Continental flights is required to park in the parking lot, rent a car, eat at a restaurant or buy a magazine. Those are all individual decisions driven by individual

perceptions of need and economic values. That is not the case with respect to the use of the airport's runways, taxiways, and airline portions of the terminal area. There, the air passenger is captive and her purse is necessarily and directly affected by Denver's charges to the airlines for those uses. Stated differently, Denver's decision to operate concessions at a profit is not an exploitation of airline passengers who have the freedom of choice to use the amenities Denver has provided.

The airlines challenge to the use of the Capital Fund is also grounded on the contention that the failure to include concession revenues in considering the costs of operating Stapleton means that the charges for airline use are unreasonable. They support this argument with *Indianapolis Airport Auth. v. American Airlines, Inc.,* 733 F.2d 1262 (7th Cir.1984), which held that concession revenues must be taken into account in determining what fees to impose upon airlines at an airport under the Anti–Head Tax Act. Although that case did not involve the use of concession revenues to build a replacement airport and therefore can be distinguished factually from the matter at hand, this court nonetheless respectfully declines to follow the Seventh Circuit's analytical approach because it is based upon a public utility analogy. Nothing in the history and purpose of the Anti–Head Tax Act indicates that Congress intended the courts to act as a public utility commission and intervene in the setting of airport rates and charges through the adoption or rejection of any particular type of cost accounting methodology. Denver's division of costs and revenues between airlines and concessionaires is facially a reasonable approach to establishing rental charges, terminal rates, landing fees and other service charges which are collected from the users of the facilities at Stapleton.

Accordingly, Denver may continue to use the surplus generated from the concession revenues in the Capital Fund for the new airport since the Anti–Head Tax Act has no application to concession rates or charges. Whether that use is consistent with the limitations imposed by the federal govern-ment in order to obtain matching federal funds for the proposed new airport is not a matter before this court. However, the court notes that Denver is not without restrictions as to how it can use concession revenues generated at Stapleton. To qualify for matching federal funds for an "airport development project," Denver must provide assurances in writing, pursuant to 49 U.S.C.App. § 2210(a)(12), that "all revenues generated by the airport, if it is a public airport ... will be expended for the capital or operating costs of the airport, the local airport system, or other local facilities which are owned or operated by the owner or operator of the airport and directly and substantially related to the actual air transportation of passengers or property." The enforcement of this section is exclusively within the administrative authority of the Secretary of the Department of Transportation.

■ The second question presented is whether the assessment by Denver of certain new airport costs to the airlines through current Stapleton terminal rental rates and landing fees is prohibited by the Federal Anti–Head Tax Act. There is no doubt that terminal rental rates and landing fees charged to the airlines at Stapleton come within the charges prohibited by Section 1513(a) of the Act because they are indirect charges on the carrying of persons in air commerce. *Rocky Mountain Airways, Inc. v. Pitkin County,* 674 F.Supp. 312 (D.Colo.1987). The issue is whether such landing fees and terminal rental rates are permitted under Section 1513(b) as a matter of law.

Section 1513(b) expressly provides that certain types of "reasonable rental charges, landing fees, and other service charges" can be collected; however these charges and fees are to be collected from a particular group, "aircraft operators," and only "for the use of airport facilities." The plain language of the statute clearly prohibits the assessment of the costs of planning, acquiring or developing a new airport facility through the rates, fees and charges to the airlines now using Stapleton. The airline charges currently imposed by Den-

ver to recover new airport costs are the very type of charges that Congress sought to pre-empt in the Anti–Head Tax Act. Simply stated, since the airlines are unable to use airport facilities which do not yet exist, Denver cannot charge them and their passengers for any costs connected with a replacement facility before that facility is in use.

This court is convinced after examining the legislative history and purpose of the Anti–Head Tax Act that in order to avoid the double taxation of air passengers in air commerce through local and federal use taxes, Congress prohibited the imposition of such local taxes, fees, and charges that would be passed on to the flying public *except* where those taxes, fees, and charges are to be used to operate and maintain the presently existing airport facilities. *Cf. Raleigh–Durham Airport Auth. v. Delta Air Lines, Inc.*, 429 F.Supp. 1069 (D.N.C.1976) (Pursuant to North Carolina statute governing charges imposed by municipal airport, court finds it unreasonable to include in rate structure of landing fees the interest on revenue bonds used to buy land for runway not yet in service).

Congress sought to prohibit "financial windfalls" from state and local assessments of "user" taxes by passing the Anti–Head Tax Act. As a result of the *Evansville* decision, some state and local governments had begun imposing head taxes on air passengers to generate revenues, not for use at the local airport, but for their general fund. Consequently, the Anti–Head Tax Act also became a means to protect the flying public from this type of "financial windfall" from "undue and discriminatory" taxation. S.Rep. No. 93–12, 93d Cong., 1st Sess., *reprinted in* U.S. Code Cong. & Admin.News 1434, 1446; 119 Cong.Rec. 3349 (statement of Sen. Cannon). The land acquisition interest charges assessed by Denver to the airlines are the sort of "financial windfalls" contemplated by Congress since there is no assurance that the proposed new airport will be built or that the defendant airlines will ever actually use the new airport.

There are no cases that have specifically addressed the legal propriety of pre-funding a planned, but non-existent replacement airport through the involuntary assessment of fees and charges to airlines that use the currently existing airport facilities. Denver contends that it is entitled to charge for new airport costs in advance of its construction and beneficial use by relying on a First Circuit Court of Appeals case, *American Airlines, Inc. v. Massachusetts Port Auth.*, 560 F.2d 1036 (1st Cir.1977). In that case, the court upheld a 52% increase in landing fees for air carriers at Logan Airport which the airport had levied to pay for three runway projects, one of which was never used.

Denver argues that there is no legitimate distinction between the addition of new runways at an existing airport as opposed to the development of a replacement facility where, as must now be assumed, the replacement is necessary because of perceived inadequacies of the existing facility. In this court's view there is a qualitative distinction to be made. United and Continental are users of Stapleton and they have existing lease agreements for the continued and future use of that airport through 1993. The lease agreements provide that Denver can make changes at Stapleton and, in fact, there has been continuing expansion and alterations of the airport during the terms of the airlines' leases. But, the airlines are under no existing legal obligation to use a replacement airport.

Increasing the cost of airline passengers' current use of Stapleton by including the costs of a planned, but undeveloped airport in their ticket prices is analogous to charging tolls to travelers over an existing highway or bridge to create a fund to build a different road or bridge at a different site for future use by other travelers. *See Evansville*, 405 U.S. at 715, 92 S.Ct. at 1354. Such charges are unreasonable as a matter of law because they do not relate to the present use of the existing public facility.

In conclusion, the Federal Anti–Head Tax Act prohibits Denver from including costs attributable to the planning and de-

velopment of a new airport in assessing rentals, fees and charges to the airlines for their use of Stapleton. Procedurally, these conclusions of law on agreed facts are only partial adjudications of the claims and counterclaims in this civil action and the orders entered are interlocutory orders under Rule 56(d) of the Federal Rules of Civil Procedure.

Accordingly, it is

ORDERED that as a matter of law the Anti–Head Tax Act does not prohibit Denver from using the Capital Fund for costs connected with the proposed new airport, and it is

FURTHER ORDERED that as a matter of law the Anti–Head Tax Act does prohibit Denver from recovering costs connected with the proposed new airport in the current rental rates, fees and charges assessed to United Air Lines, Inc. and Continental Air Lines, Inc. for their use of Stapleton International Airport, and it is

FURTHER ORDERED, that a status conference will be held in Courtroom A, Post Office Building, 18th and Stout Streets, Denver, Colorado at 9:00 a.m. on June 15, 1989.