# Application of the Airport and Airway Improvement Act to the Proposed Lease of the Albany County Airport

Section 511(a)(12) of the Airport and Airway Improvement Act permits an airport owner or operator to recoup its unreimbursed capital or operating costs from airport revenues, regardless of when the expenses were incurred. The Federal Aviation Administration, however, in the exercise of discretion conferred upon the Secretary of Transportation by the Act, may oversee the rates charged to airport users by private lessees to ensure that such rates remain fair and reasonable

February 12, 1991

MEMORANDUM OPINION FOR THE ACTING GENERAL COUNSEL
DEPARTMENT OF TRANSPORTATION

This memorandum responds to your request for our opinion on a proposed lease arrangement pursuant to which Albany County, New York, the owner of Albany Airport, would lease the Airport to a private joint venture.[1] You have asked us to address two narrow questions. First, you have asked whether the County's use of an initial lease payment of thirty million dollars for general expenditures unrelated to the Airport would violate section 511(a)(12) of the Airport and Airway Improvement Act of 1982, as amended (the "AAIA"), 49 U.S.C. app. § 2210(a)(12). That section requires airport owners or operators who receive federal assistance to use all airport-generated revenues "for the capital or operating costs of the airport, the local airport system, or other local [airport-related] facilities." Second, you have

---

[1] Letter for William P. Barr, Assistant Attorney General, Office of Legal Counsel, from Philip D. Brady, General Counsel, Department of Transportation (Mar. 5, 1990) (the "March Letter"). Mr. Brady subsequently provided us with an undated and unsigned memorandum of law prepared by the Federal Aviation Administration ("FAA") (the "FAA Memorandum") discussing the issues raised by the proposed lease. Letter for J. Michael Luttig, Acting Assistant Attorney General, Office of Legal Counsel, from Philip D. Brady, General Counsel, Department of Transportation (July 27, 1990).

You have also provided us with internal legal memoranda prepared by the Department of Transportation and the FAA, certain correspondence between the FAA and Albany County, and a memorandum presenting the views of USAir, a current user of the Albany Airport. We have also received the written views of Baker, Worthington, Crossley, Stansbetty & Wolf, counsel to Lockheed Air Terminal.

asked whether the AAIA permits the FAA to oversee the lessee's recoupment of the thirty million dollars through rates charged to current and future airport users.[2]

The County maintains that its use of the thirty million dollar payment for general municipal purposes does not violate the revenue-retention requirement in the statute because the payment constitutes reimbursements for capital and operating costs that the County has incurred for the Airport over the past three decades. The FAA argues, however, that section 511(a)(12) does not permit an airport owner or operator to elect to recoup its capital and operating investments in an airport as long after those investments were made as it has been since Albany County made its investments.

We conclude that section 511(a)(12) of the AAIA permits an airport owner or operator like Albany County to recoup its unreimbursed capital and operating expenses from airport revenues, regardless of when the expenses were incurred. The statute requires only that airport revenues be used "for the capital or operating costs" of the airport. The use of airport revenues to reimburse past capital or operating expenses may fairly be characterized as an expenditure "for the capital or operating costs" of the airport within the meaning of the statute. We also conclude, however, that the FAA has discretion under other provisions of the AAIA to oversee the rates that the private lessee charges airport users. Therefore, whether and to what extent those rates should be permitted to reflect the lessee's investment, including the thirty million dollar payment, is a judgment that must be made in the first instance by the FAA.[3]

## I.

Albany County has requested the FAA to approve a proposal made by a joint venture consisting of British American, Ltd. and Lockheed Air Terminal ("BALLAT"), to lease Albany Airport from the County for forty years, with an option to renew the lease for an additional forty years, and to manage the Airport either directly or through BALLAT's affiliates.[4] Under the

---

[2] In his original request, Mr. Brady framed the issue raised by the proposed lease in terms of whether "recoupment of *a private lessee's* up-front or periodic payments from airport user charges would be inconsistent with [section 511(a)(12)]" if the private lessee "retain[s] any portion" of such charges for its own use. March Letter at 1, 2 (emphasis added). Mr. Brady thereafter recast the request and asked us to address (1) whether the AAIA permits *Albany County* to use the thirty million dollar payment for general expenditures; (2) whether the lessee may charge the thirty million dollar payment, as well as certain other expenses, such as management and construction fees, to airport users; and (3) whether, under the proposed lease, the County would retain sufficient control of the Airport to satisfy the contractual assurance and funding eligibility requirements of the AAIA. FAA Memorandum at 3. As we have discussed with your office, the only issues we address herein are the two presented by your modified request and set forth in the text above. The remaining issues you have raised turn on policy judgments that must be made in the first instance by the FAA. *See* discussion *infra* note 15.

[3] In his original request, Mr. Brady asked us whether it makes any legal difference if the lessee is a public rather than a private entity. March Letter at 2. We do not believe that it does.

[4] The Secretary of Transportation has delegated the Administrator of the FAA the authority to carry out the functions vested in the Secretary by the AAIA. Memorandum for the Federal Aviation Administrator, from

Continued

27

terms of the proposal, Albany County would receive an initial payment of thirty million dollars, lease payments of $500,000 per year for the first twenty years, and lease payments of one million dollars per year thereafter. The County, which will retain title to the airport, intends to place the annual lease payments in an interest-bearing account for use in airport development and to use the thirty million dollar payment for general expenditures unrelated to the Airport.[5] There is no dispute that the thirty million dollar payment to the County constitutes "revenue[] generated by the airport" within the meaning of section 511(a)(12). *See FAA Memorandum* at 3-4.[6] Furthermore, the FAA does not contest that as a general matter section 511(a)(12) permits an airport owner or operator to recoup airport-related capital and operating costs through airport revenues. *Id.* at 5. The narrow questions before us, therefore, are whether the statute imposes a temporal limitation on the recovery of such costs and, if not, whether the FAA can oversee BALLAT's recoupment of its payment to the County through rates charged to airport users.

According to the FAA, *see id.* at 4, the County contends that it may use the thirty million dollar payment for general municipal purposes without violating the revenue-retention requirement in section 511(a)(12) because the payment represents reimbursement for capital and operating costs that the County has incurred for the Airport over the past three decades.[7] In

---

[4](....continued)
Drew Lewis, Secretary of Transportation (Sept. 15, 1982). The County cannot transfer a property interest in the Airport without the approval of the FAA because the County has received approximately twenty-four million dollars in federal assistance under the AAIA and related programs since acquiring the Airport from the City of Albany in 1960. As an AAIA grantee, the County has agreed that "[i]t will not sell, lease, encumber or otherwise transfer or dispose of any part of its title or other interests in the [Airport] property . . . for the duration of the terms, conditions, and assurances in the grant agreement without approval by the Secretary." FAA Advisory Circular No. 150/5100-16A, app. 1 at 3 (Oct. 4, 1988). Even if the proposed lease is executed, the County would remain subject to the assurance requirements in section 511(a). *Id.*; *see also infra* note 11. The County's obligations under the grant assurance requirements do not expire until the year 2010. *See* FAA Memorandum at 2.

[5] The thirty million dollars would be paid by BALLAT to the County as consideration for a 170-acre parcel of land adjacent to the Airport. BALLAT will immediately transfer the parcel back to the County, however, for one dollar for inclusion in the Airport's layout plan. FAA Memorandum at 1.

[6] *See also* FAA Order No. 5100 38A at 73 (Oct. 24, 1989) ("Airport revenue is revenue generated by facilities and activities on or off airport. Examples of airport revenue include revenue from service fees, landing fees, lease or rental fees, usage fees, sale of commodities such as agricultural or forest products, proceeds from mineral sales, or other net revenue produced from real property."). When it was originally proposed that the Airport be sold to BALLAT rather than leased, proponents of the arrangement argued that the thirty million dollar payment to the County was not airport revenue. Memorandum of Baker, Worthington, Crossley, Stansberry & Wolf at 7-8 (Aug. 3, 1990). To our knowledge, however, none of the parties now contends that the lease payment is not "revenue[] generated by the airport."

[7] Preliminary information furnished to the FAA by the County indicates that its unreimbursed capital and operating costs consists of (1) $4.437 million in cash paid to the City of Albany in 1960; (2) $8.62 million in outstanding debt related to the Airport; (3) $9.148 million transferred to the Airport by the County between 1963 and 1985; and (4) $4.194 million in services contributed by the County for the benefit of the Airport, for a total of approximately $26.3 million. FAA Memorandum at 4. We express no view herein on the accuracy of these figures. We note, however, that the AAIA grants the FAA discretion to impose documentation and accounting requirements on airport owners and operators. *See* 49 U.S.C. app. § 2210(a)(10) ("[T]he airport operator or owner will submit to the Secretary such . . . airport financial and operations reports as the Secretary may reasonably request . . . ."). Thus, the FAA may require the County to produce records sufficient to support the amounts claimed.

28

other words, the County maintains that the lease proposal would merely permit it to recover its earlier airport-related expenses which, consistent with section 511(a)(12), it could have elected to recover from airport revenues at the time the expenses were incurred. *See id.* at 5.[8]

The FAA, on the other hand, argues that section 511(a)(12) "contemplates a timing relationship between the expenditures for capital or operating costs (or the commitment to do so) and the actual recoupment of revenues." *Id.*[9] The FAA does not define the time period within which capital or operating expenditures must be recouped. It simply contends that section 511(a)(12) implicitly requires that an airport owner or operator elect to recoup such costs at the time the costs are incurred, or within a relatively short period of time thereafter. *Id.*[10]

## II.

Under the AAIA, both "public" and "public-use" airports may apply for federal grants to help fund airport development projects. 49 U.S.C. app. §§ 2202(a)(22), 2208(a)(1). If an application for AAIA assistance is approved, the United States will typically bear ninety percent of the project costs. *Id.* § 2209(a). Section 511(a) of the AAIA requires that as a condition to approval of a project grant, the airport owner or operator must provide certain written "assurances" to the Secretary of Transportation. *Id.* § 2210(a).[11] In order to comply with section 511(a), an airport owner or operator who receives

---

[8] The permissibility of the County's proposed use of the thirty million dollar payment depends entirely upon the County's unreimbursed capital and operating costs, *not* the capital or operating costs of BALLAT. In turn, whether BALLAT can charge the thirty million dollars to airport users depends upon whether, in the FAA's view, the inclusion of the thirty million dollars in BALLAT's rates is consistent with the County's continuing obligation under the AAIA to make the Airport available for public use on fair and reasonable terms. *See* discussion *infra* Part III.

[9] In recent years, the FAA appears to have expressed different views on the timing issue. In 1985, the FAA relied upon an argument similar to the one it advances here in rejecting a proposal by the City of Burlington, Vermont, to use surplus revenues from Burlington International Airport to reimburse the City for unreimbursed airport subsidies. Letter for the Honorable Bernard Sanders, Mayor of Burlington, Vermont, from J.W. Murdock III, Chief Counsel, FAA (Jan. 8, 1985).

In 1989, however, in response to a proposal by the Albany Capital District Transit Agency whereby the Transit Agency should have acquired a long-term lease interest in the Airport for $25.25 million, the FAA Chief Counsel replied that "if the payment to Albany County is limited to payment of the currently outstanding debt incurred for the capital or operating costs of the airport, we would not expect major obstacles to transfer." Letter for the Honorable James T. Coyne, Albany County Executive, from Gregory S. Walden, Chief Counsel, FAA at 2 (Dec. 4, 1989).

For the reasons discussed in Part II below, we believe that the latter view more accurately reflects the correct interpretation of section 511(a)(12)

[10] We do not understand the FAA to argue that once an airport owner or operator has elected to recover capital or operating costs, the recovery must necessarily be accomplished within a particular period of time. Indeed, section 511(a)(12) itself contemplates the use of airport revenues to retire long-term debt.

[11] Section 511 provides in part:

    (a) Sponsorship

        As a condition precedent to approval of an airport development project contained in a project grant application submitted under this chapter, the Secretary [of Transportation] shall receive assurances, in writing, satisfactory to the Secretary, that

Continued

federal assistance must satisfy all of the contractual assurance requirements enumerated in the statute.

Section 511(a)(12) requires that an airport owner or operator provide the Secretary with assurances that "all revenues generated by the airport" will be expended for "capital or operating costs" related to the airport. 49 U.S.C. app. § 2210(a)(12).[12] The FAA agrees (as it must) that there is no express limitation in section 511(a)(12) on the time within which airport capital and operating costs may be recovered through airport revenues, or any affirmative evidence in the history of section 511(a)(12) that such a limitation should be implied. FAA Memorandum at 4-5, 6. The FAA argues, however, that the text and history of the AAIA as a whole indicate that Congress intended to incorporate such a limitation in section 511(a)(12). *Id.* at 5-7. We do not discern any such intent in either the text or the legislative history.

The FAA advances two essentially textual arguments in support of its position. First, the FAA analogizes unreimbursed airport expenses to "a 'debt' of the airport to the [owner or operator's] general treasury." *Id.* at 5. It then reasons from the express exception to the revenue-retention requirement

---

[11] (....continued)

> (1) the airport to which the project relates will be available for public use on fair and reasonable terms and without unjust discrimination. . . .
>
> . . .
>
> (12) *all revenues generated by the airport,* if it is a public airport, and any local taxes on aviation fuel (other than taxes in effect on December 30, 1987) *will be expended for the capital or operating costs of the airport,* the local airport system, or other local facilities which are owned or operated by the owner or operator of the airport and directly and substantially related to the actual air transportation of passengers or property; except that if covenants or assurances in debt obligations issued before September 3, 1982, by the owner or operator of the airport, or provisions enacted before September 3, 1982, in the governing statutes controlling the owner or operator's financing, provide for the use of revenues from any of the airport owner or operator's facilities, including the airport, to support not only the airport but also the airport owner or operator's general debt obligations or other facilities, then this limitation on the use of all other revenues generated by the airport (and, in the case of a public airport, local taxes on aviation fuel) shall not apply. . . .
>
> (b) Compliance
>
> To insure compliance with this section, the Secretary shall prescribe such project sponsorship requirements, consistent with the terms of this chapter, as the Secretary considers necessary.

49 U.S.C. app. § 2210 (emphases added); *see also* FAA Advisory Circular No. 150/5100-16A, app. 1 at 6, 7 (Oct. 4, 1988) (incorporating language of sections 511(a)(1) and 511(a)(12) into the contractual assurances required of grant recipients).

[12] The phrase "capital or operating costs" in section 511(a)(12) is not defined. The Supreme Court has stated, however, that "it should be generally assumed that Congress expresses its purposes through the ordinary meaning of the words it uses." *Escondido Mut. Water Co. v. La Jolla Band of Mission Indians,* 466 U.S. 765, 772 (1984). "Capital costs" and "operating costs" are generally understood as referring, collectively, to all of the costs incurred by a business. *See, e.g.,* Eric Louis Kohler, *A Dictionary for Accountants* at 82, 333 (5th ed. 1975). Consistent with this common meaning, section 511(g) of the AAIA, which permits the use of certain airport-generated revenues in the State of Hawaii for highway construction projects, broadly defines the phrase "airport capital and operating costs" as "costs incurred . . . for operation of all airports . . and costs for debt service incurred . . . in connection with capital projects for such airports, including interest and amortization of principal costs." 49 U.S.C. app. § 2210(g)(4)(A). The FAA does not suggest that a different meaning should be ascribed to the phrase "capital or operating costs" in section 511(a)(12)

30

in section 511(a)(12) for certain non-airport-related debt obligations incurred prior to the effective date of the AAIA that the statute generally does not permit an airport owner or operator to recoup past capital or operating expenses on a reimbursement theory. We do not believe that the exception in section 511(a)(12) supports the inference that the FAA would have us draw. The exception merely permits airport owners or operators to use airport revenues to retire certain debt obligations that were incurred for expenditures that were *not* airport-related. The exception implies nothing about the recoverability of costs that *were* airport-related, and certainly nothing about a time limitation on the recoverability of airport-related costs. Indeed, if the exception suggests anything about the proper interpretation of section 511(a)(12), it is that when Congress intended to limit or to permit the recovery of costs based upon when the costs were incurred, it did so expressly.

Second, the FAA advances a similar textual argument based upon a 1987 amendment to the revenue-retention requirement. As originally enacted in 1982, section 511(a)(12) of the AAIA permitted an airport owner to use airport revenues "for . . . other local facilities which are owned or operated by the owner or operator of the airport and directly related to the actual transportation of passengers or property." Tax Equity and Fiscal Responsibility Act ("TEFRA"), Pub. L. No. 97-248, tit. V, § 511(a)(12), 96 Stat. 324, 687 (1982). In 1987, section 511(a)(12) was amended by, inter alia, requiring that such local facilities be "directly and substantially related to the actual air transportation of passengers or property." Airport and Airway Safety and Capacity Expansion Act of 1987, Pub. L. No. 100-233, tit. I, § 109, 101 Stat. 1486, 1499. The FAA asserts, without explanation, that "[t]his limitation is inconsistent with the broad interpretation [of the statute] required for the reimbursement theory." FAA Memorandum at 6.

The 1987 amendment, however, is not inconsistent with the recovery of unreimbursed, airport-related capital or operating expenses under the statute. The 1987 amendment simply narrowed the permissible uses of airport revenues to expenditures that were not only "directly" but also "substantially" related to actual air transportation, to further ensure that such revenues would not be diverted for general expenses. *See* H.R. Conf. Rep. No. 484, 100th Cong., 1st Sess. 63-64 (1987); H.R. Rep. No. 123, 100th Cong., 1st Sess., pt. 2, at 13 (1987). The amendment thus is concerned solely with the relationship between expenditures and transportation services provided by the airport (*i.e.*, the relationship must be "direct[] and substantial[]"); the amendment simply does not bear on whether Congress did or did not intend to limit the recoverability of past capital or operating costs after a certain period of time.[13]

---

[13] The FAA also submits that an airport owner or operator's recoupment of unreimbursed investments is inconsistent with sections 511(a)(1) and 511(a)(3) of the AAIA, 49 U.S.C. app. §§ 2210(a)(1), (a)(3), which require, respectively, that an airport owner or operator provide assurances to the Secretary that "the airport . . . will be available for public use on fair and reasonable terms and without unjust discrimination," and that "the airport and all facilities thereon or connected therewith will be suitably operated and maintained " FAA Memorandum at 5-6, 8. Although the requirement in section 511(a)(1)

Continued

31

Apart from its arguments from the text of the AAIA, the FAA asserts that the "legislative history of the [Act] and predecessor legislation indicates strong congressional concerns about the use of funds generated at [federally financed] facilities." FAA Memorandum at 6. The FAA, however, does not cite to any particular passage in the legislative record that in any way suggests that Congress intended to impose a temporal limitation on the recoverability of unreimbursed "capital or operating costs" through airport revenues, and we have not found any evidence in the legislative history that Congress intended such a limitation.

The AAIA was enacted in 1982 as title V of TEFRA, Pub. L. No. 97-248, 96 Stat. 324, 671. The House and Senate Conference Reports of TEFRA describe the revenue-retention requirement in section 511(a)(12) as follows:

> One [requirement] is that airports receiving assistance under this program must dedicate all revenues generated by the airport for the capital [and] operating costs of that airport, the local airport system, or other local facilities which are owned by the owner or operator of the airport and used for the transportation of passengers or property. This provision is designed to ensure that airport systems which are receiving Federal assistance are utilizing all locally generated revenue for the systems which they operate. Airports that are part of a unified ports authority are exempt from this requirement if covenants or assurances in previously issued debt obligations or controlling statutes require that these funds are available for use at other port facilities.
>
> However, airports users should not be burdened with "hidden taxation" for unrelated municipal services.

H.R. Conf. Rep. No. 760, 97th Cong., 2d Sess. 712 (1982); S. Conf. Rep. No. 530, 97th Cong., 2d Sess. 712 (1982); *see also* S. Rep. No. 494, vol. 2, 97th Cong., 2d Sess. 28 (1982); S. Rep. No. 97, 97th Cong., 1st Sess. 27-28 (1981).[14] As the Conference Reports state, section 511(a)(12) is intended to

<hr />

[13](....continued)
that an airport be made available "on fair and reasonable terms" may, in practical effect, ultimately limit an owner or operator's ability to recoup unreimbursed investments from airport users, section 511(a)(1) cannot be read to flatly prohibit such recoupment. The FAA alternatively suggests that section 511(a)(3) prohibits the contemplated reimbursement because it requires an airport owner or operator "to spend its *own* money to keep the airport running." FAA Memorandum at 8 (emphasis added). Neither the text nor the legislative history of section 511(a)(3) in any way supports this assertion.

[14] Some legislative materials relevant to the interpretation of the AAIA pre-date its enactment in 1982. The AAIA was originally passed by the Senate in 1980, but failed to receive consideration in the House prior to the end of the 96th Congress In 1981, the AAIA was reported out of the Senate Committee on Commerce, Science, and Transportation, but was not passed in either chamber. *See* S. Rep. No. 97, 97th Cong., 1st Sess. 1-2 (1981).

ensure that airport owners or operators who receive federal assistance "are utilizing all locally generated revenue for the systems which they operate," and that the users of such airports are "not . . . burdened with 'hidden taxation' for unrelated municipal services." The plain purpose of section 511(a)(12) is simply to prevent an airport owner or operator who receives federal assistance from using airport revenues for expenditures unrelated to the airport. Thus, a grant recipient cannot use airport revenues to pay for "capital or operating costs" that are not airport-related. There is no suggestion, however, that section 511(a)(12) was intended to limit the time within which an airport owner or operator may elect to recover "capital or operating costs" that are airport-related.

The FAA finally argues that construing section 511(a)(12) to permit airport owners or operators to recoup their past capital or operating expenses from airport revenues on a reimbursement theory is unwise as a matter of policy, and would raise a host of administrative difficulties. FAA Memorandum at 7-12. Whatever the merits of these policy arguments, they do not support the conclusion that, as a matter of law, section 511(a)(12) precludes the recoupment of such expenses on a reimbursement theory.[15]

In sum, section 511(a)(12) does not by terms impose a temporal limitation on the recovery of airport capital or operating costs through airport revenues, nor is there any evidence that Congress intended to impose such a limitation. Accordingly, we conclude that, consistent with section 511(a)(12), an airport owner or operator may elect to recoup its airport-related capital or operating costs when the costs are incurred or at any time thereafter.

## III.

You have additionally asked us whether, assuming that Albany County is permitted to accept and use the thirty million dollar lease payment for general expenditures unrelated to the Airport, the FAA retains authority to oversee the rates the BALLAT charges to airport users. We conclude that the FAA does retain such authority. Section 511(a)(1) of the AAIA provides in part

---

[15] Among other things, the FAA argues that the lease of an airport may collapse traditional distributions between airport owners and operators, who are required to keep revenues on-airport, and airport businesses such as service providers and concessionaires, who are permitted to take revenues off-airport, raising issues as to whether various kinds of income received by the lessee constitute "revenues generated by the airport" within the meaning of section 511(a)(12). FAA Memorandum at 8-10. In addition, the FAA questions whether a lease arrangement affords an airport owner or operator sufficient control of the airport to satisfy its assurances of compliance with the requirements of section 511(a) as a whole, and to remain eligible for federal funds. *Id.* at 10-13.

These questions call for policy judgments that must be made — and, in our understanding, traditionally have been made — in the first instance by the FAA. *See, e.g., id.* at 9 ("It would be possible, *applying principles of traditional public utility rate regulation and existing FAA policy,* to make judgments about what categories of 'costs' can be included in the rate base.") (emphasis added); *id.* at 11 ("the [lease] arrangement is inherently inconsistent with the sponsor's obligation to provide *adequate* assurances" to the Secretary). We therefore do not address which airport receipts received by BALLAT in its capacity as lessee would constitute "revenues generated by the airport" within the meaning of the statute, or whether the lease of Albany Airport is consistent with the County's obligation under the AAIA to maintain control of the Airport. *See* discussion *supra* note 2.

33

that, as a condition to approval of a project grant, an airport owner or operator must assure the Secretary of Transportation that "the airport to which the project relates will be available for public use on fair and reasonable terms." 49 U.S.C. app. § 2210(a)(1).[16] Although the FAA does not view the AAIA as having established a "full-scale ratemaking regulatory regime," FAA Memorandum at 5-6, the FAA acknowledges that under the authority of section 511(a)(1), it currently "review[s] the reasonableness of the level and structure of specific airport charges." *Id.* at 6; *see also id.* at 9.[17] Consistent with section 511(a)(1) and the discretion that has traditionally been conferred on administrative bodies that monitor the rates charged by a regulated industry, we believe that the AAIA grants the Secretary of Transportation substantial discretion to limit the rates charged to airport users by BALLAT. It would be within the discretion of the FAA, for example, to employ historical cost ratemaking principles or some other approach in determining whether the rates charged by BALLAT are "fair and reasonable." The methodology imposed by the FAA will in turn determine whether and to what extent the rates BALLAT charges airport users may reflect BALLAT's lump sum payment to the County.

## CONCLUSION

We conclude for the foregoing reasons that section 511(a)(12) of the AAIA does not limit the time within which an airport owner or operator may recoup unreimbursed capital or operating costs through airport revenues. We

---

[16] Section 511(a)(1) continues a provision that originally appeared in the Federal Airport Act of 1946, ch. 377, § 11(1), 60 Stat. 170, 176, and was subsequently reenacted in the Airport and Airway Development Act of 1970, Pub. L. No. 91-258, tit. I, § 18(1), 84 Stat. 219, 229. The phrase "fair and reasonable terms" is not defined in the 1946 Act, the 1970 Act, or the AAIA, and the legislative history of this provision is sparse. *See, e.g.,* H.R. Rep. No. 844, 79th Cong., 1st Sess. 4 (1945) ("The Administrator [of Civil Aeronautics] may require project sponsors to enter into agreements insuring, among other things, the continued availability of the airport for public use on fair and reasonable terms . . . ."); *see also* H.R. Rep. No. 601, 91st Cong., 1st Sess. 24 (1969); H.R Conf. Rep. No. 760, 97th Cong., 2d Sess. 711-12 (1982). The standard in section 511(a)(1) is comparable to the standard in the Anti-Head Tax Act, which provides in part that a State or political subdivision thereof that owns or operates an airport may "levy[] or collect[] reasonable rental charges, landing fees, and other service charges from aircraft operators for the use of airport facilities." 49 U.S.C. app. § 1513(b).

[17] *Cf.* 49 U.S.C. app. § 2218(a) ("The Secretary is empowered to perform such acts . . . pursuant to and consistent with the provisions of this chapter, as the Secretary considers necessary to carry out the provisions of . . this chapter."); *New England Legal Found. v. Massachusetts Port Auth.,* 883 F.2d 157, 169 (1st Cir. 1989) (noting that "Congress has entrusted the administration of § 511 to the Secretary" and within the bounds of the statutory framework "the Secretary has wide discretion"), *City of Denver v. Continental Air Lines, Inc.,* 712 F. Supp. 834, 839 (D. Colo. 1989) ("The enforcement of . . section [511(a)(12)] is exclusively within the administrative authority of the Secretary of the Department of Transportation.").

34

also conclude, however, that in the exercise of the discretion conferred upon the Secretary of Transportation by the AAIA, the FAA may oversee the rates charged to airport users by BALLAT — including the extent to which they may permissibly reflect BALLAT's thirty million dollar payment to Albany County — to ensure that these rates remain fair and reasonable.

J. MICHAEL LUTTIG
*Assistant Attorney General*
*Office of Legal Counsel*
