NORTHWEST AIRLINES, INC.; Simmons Airlines, Inc.; Piedmont Aviation, Inc.; Comair, Inc.; Midway Airlines (1987), Inc. formerly, Fischer Bros. Aviation, Inc.; USAir, Inc.; American Airlines, Inc.; and United Air Lines, Inc., Plaintiffs,

v.

COUNTY OF KENT, MICHIGAN; The Kent County Board of Aeronautics; and The Kent County Department of Aeronautics, Defendants.

No. 1:88–CV–243.

United States District Court, W.D. Michigan, S.D.

June 18, 1990.

Malcolm C. Mallette, James C. McIntire, Indianapolis, Ind., Douglas E. Wagner, Mark S. Bransdorfer, Grand Rapids, Mich., for plaintiffs.

W. Fred Hunting, Jr., Robert A. Buchanan, Mark S. Allard, Grand Rapids, Mich., for defendants.

## OPINION OF THE COURT

ROBERT HOLMES BELL, District Judge.

On April 1, 1988, plaintiffs filed suit in this Court alleging that the rates charged plaintiffs by defendants were unreasonable and in violation of federal and state law. Plaintiffs are commercial airlines which use the Kent County International Airport (Airport). Defendants are Kent County, the Kent County Department of Aeronautics and the Kent County Aeronautics Board (KCAB). The Airport is located in and owned by Kent County, Michigan. The KCAB is the arm of Kent County which manages the Airport and determines the rates to be charged the various users.

### Procedural History

In their complaint and amended complaints, plaintiffs alleged that the landing fees, rental rates and aircraft parking fees set by the KCAB by resolution effective April 1, 1988 were unlawful. Plaintiffs alleged that these fees violated the Commerce Clause of the United States Constitution (U.S. Const. Art. I, § 8, cl. 3), the Anti–Head Tax Act (AHTA) (49 U.S.C.App. § 1513), the Airport and Airway Improvement Act (AAIA) (49 U.S.C.App. § 2201 et seq.) and any applicable state laws. Defendants answered by asserting that the federal statutes did not confer jurisdiction on this Court in this situation and asserting that the fees charged were reasonable. Defendants filed a counterclaim asking the Court to require plaintiffs to pay defendants the difference between what plaintiffs were paying and the new rates (Ordinance Rates). Defendants also sought a finding by this Court that plaintiffs were now month-to-month tenants. By stipulation of the parties in November 1988, the parties agreed that the plaintiffs would continue to pay the fees specified in plaintiff's most recent leases during the pendency of this matter. The parties stipulated that such interim fee payments would not serve as a waiver on the question of the reasonableness of any of the fees.

In January 1989, plaintiffs and defendants filed cross motions for summary judgment. Although plaintiff's motion asked for summary judgment on all issues, the Court, by agreement of the parties, addressed only the issue of the legality of the rate making methodology employed by the KCAB. In an opinion and order entered June 22, 1989, the Court denied plaintiffs' motion for summary judgment finding that it could not rule that the methodology used by the KCAB in setting rates was *per se* illegal. The Court found that the methodology could be used to formulate reasonable fees.

In January 1990, the parties again filed cross motions for summary judgment. Defendants sought to have all of plaintiffs' claims dismissed on the basis that there was no federal question involved. Plaintiffs sought summary judgment on the basis that the facts were now undisputed that defendants rates were unreasonable. The Court granted partial summary judgment for defendants and denied plaintiffs' motion for summary judgment. The Court found that there was no cause of action under the Commerce Clause and that there was no private right of action under the AAIA. However, the court found that plaintiff did state a cause of action under the AHTA.

This case went to trial before the Court on February 12, 1990 on the question of whether the rates charged plaintiffs violated the AHTA. Defendants argued that the rates did not violate the AHTA and were supported by Michigan law, being M.C.L. § 259.133; M.S.A. § 10.233. The parties submitted proposed findings of fact and conclusions of law to the Court. By a preponderance of the evidence, the Court has made the findings of fact set forth in the following section of this opinion.

## Background

The Court finds that the Airport has three runways. One east-west runway is a 10,000 foot runway that serves both commercial airlines and general aviation aircraft. General aviation aircraft are corporate aircraft and privately owned aircraft that are not in commercial, passenger, cargo or military service. Two of the runways are too short to serve most jet aircraft and serve general aviation aircraft with only occasional use by commuter airline aircraft.

The Court finds that the Airport has an air passenger terminal building used by the KCAB for administrative offices, by government agencies, by plaintiffs and by a number of concession users. There is a terminal building apron in the landing area which is used by plaintiffs and on which plaintiffs' planes rest when they are at the airline gates. Airline passengers and those greeting airline passengers park in a passenger terminal building parking lot ("Parking Lot") for which they are charged. Employees of the airlines and others having business at the Airport park in an employees' parking lot without charge.

The Court finds that the Airport has extensive hangers for general aviation aircraft, together with concrete and grass parking areas for general aviation aircraft. There are three fixed base operators that service and repair general aviation aircraft. Steel Case and Amway have large corporate hangers at which they service and maintain corporate general aviation aircraft, including a 727 and two BAC–111 jet aircraft. Over 160 general aviation aircraft are based at the Airport.

The Court finds that the relationship between the Airport, plaintiffs and other nonairline concessionaires is one of landlord and tenant. This relationship manifests itself in leases entered into between the Airport and various users of the Airport. Although the Airport establishes the rates and fees to be charged to plaintiffs, the history of the parties demonstrates that the rates and fees finally incorporated in leases were determined through negotiations between the Airport and plaintiffs. This process broke down after the expiration of the last leases on January 1, 1987. Due to the inability of the parties to reach any negotiated agreement in 1987 or 1988, the KCAB implemented new rates by way of resolution on April 1, 1988 (the Ordinance Rates).

The Court finds that generally airports formulate rates and fees for airline tenants using either a compensatory or residual cost methodology. Compensatory methods base rates and fees on the actual cost of providing the particular facility and services used. Residual cost methods base the rates and fees on the total cost of operation of the airport. The essential difference between these methods is that a compensatory methodology does not take into account any interdependencies between the various airport revenue centers in establishing rates and fees. A residual cost method recognizes such interdependencies and cross credits revenues generated by one tenant among contributing tenants.

The Court finds that since 1968 the KCAB has used a compensatory methodology known as the Buckley Methodology.[1] As used by the KCAB, the Buckley method attempts to assess user fees and rental rates only for plaintiffs' use of the facilities, services, and certain other allocable operating costs (overhead, maintenance and administration). The Buckley method does not base its cost analysis on the replacement cost value or the current market value of the land or facilities. Rather, it uses the historic actual cost of the assets. The cost basis does not include taxes and does not include the cost to the Airport for various nonairline services or other tenants, such as the United States government weather service, customs office, FAA offices, the Parking Lot, various concessions (car rental, restaurant, gift shop, amusements) or the Airport motel. In addition, the KCAB deducts all state and federal funding from the cost basis. Although the

1. This compensatory method for determining user fees and rental rates was named after James E. Buckley (d. 1981), an airport consultant, who assisted in developing the Kent County International Airport. Buckley articulated his approach in "General Principles With Respect to Airport Rate Making" (Plaintiffs' Exhibit 20).

Buckley method allocates costs to be recovered from general aviation and various nonairline tenants, the rate study is not used to determine the charges for those Airport users. The Buckley method is simply a tool used to determine the break-even costs for the airlines' use of the Airport.

The Court finds that under the Buckley methodology, plaintiffs are assessed costs in three areas: runway areas, terminal area and crash fire rescue (CFR). The costs allocated to the runway area are used to determine the landing fee and the aircraft parking fee. The terminal area costs are used to determine the rental rate to be charged. The rental rates are for space plaintiffs use in the terminal. KCAB does not charge plaintiffs for parking which is made available to plaintiffs' employees, for use of conference rooms, for the roped off space in front of plaintiffs' ticket counters, for aisle space in the concourses or for lobby spaces used by passengers. The airlines are charged 100% of CFR.

The Court finds that in 1986, the KCAB, using the Buckley method, formulated the Ordinance Rates to be effective January 1, 1987. Prior to the Ordinance Rates, plaintiffs paid rates and fees from 1984 to 1987 which were set by leases which expired on January 1, 1987 (Prior Rates). The plaintiffs challenge the legality of the Buckley method and the reasonableness of both the Prior Rates and the Ordinance Rates. In that regard, plaintiffs have proposed rates and fees which they believe are reasonable. All three rates are set forth below:

|  | Prior Rates | Ordinance Rates | Airlines' Proposed Rate |
|---|---|---|---|
| Landing fee (per thousand lbs) | $.50 | $.70 | $.138 |
| Aircraft Parking Fee (per thousand lbs.) | $.44 | $.32 | N/C |
| Prime space, finished, heated, and air-conditioned space | $18.00 sq. ft. | $24.67/ sq. ft. | $8.34/ sq. ft. |
| Non-prime air-conditioned space | $11.75/ sq. ft. | $12.34/ sq. ft. | $4.17/ sq. ft. |
| Non-prime, unfinished, heated-not air conditioned space | $10.50/ sq. ft. | $12.34/ sq. ft. | $4.17/ sq. ft. |

The Court finds that in addition to the rates and fees charged the airlines, the KCAB enters into rental agreements with other Airport tenants and charges a fuel flowage fee to general aviation aircraft. Instead of charging concessions a rate per square foot, the KCAB charges them a percentage of their gross receipts. For example, the Buckley method allocates costs of approximately $28,000 (1,120 sq. ft. × $24.67/sq. ft.) to the rental car concessions. However, the rental car companies pay the Airport 10% of their gross receipts which amounts to a payment in excess of $675,000 per year. The Buckley method does not allocate any costs to the pay telephone and advertising concessions. These concessions pay the KCAB $100,000 per year with one half of that amount deducted from the costs of the terminal. The Parking Lot is allocated costs of $688,000 but generates revenues for the Airport of approximately $1,600,000 per year. These examples show a surplus from certain concessions and the Parking Lot of approximately $1,609,000. This figure does not take into account any surplus from payments made by other concessions, itinerant general aviation (such as tie down charges), fixed base operators or hanger charges to entities such as Steel Case.

The Court finds that locally based general aviation pays a fuel flowage fee of $.04 a gallon and itinerant general aviation pays a landing fee for use of the runway. The fuel flowage fee has not changed since 1967. These fees bring revenue of less than $125,000 a year to the Airport. The Buckley method allocates costs of $650,000 to general aviation. Therefore, there is a shortfall of approximately $525,000 per year from general aviation. However, even with this shortfall, the Airport receives surplus revenue from nonairline users of more than $1,000,000 per year.

The Court finds that with regard to the rates charged to plaintiffs, the Buckley method allocates $28,000 in costs for the area set aside for overnight aircraft parking. The actual fee charged plaintiffs for overnight parking amounts to more than $100,000 per year. The KCAB also charges the Airlines 100% of the crash fire rescue (CFR) costs.

The Court finds that the Airport has less than $2,000,000 in outstanding debt, the balance of which will be retired in 1994. At the end of 1989, the Airport had reserves of over $9,000,000.

*Analysis*

The basic issue before the Court is whether rates and fees charged and proposed to be charged plaintiffs by defendants are reasonable under the AHTA. Plaintiffs have the burden of proving that the rates and fees are unreasonable in light of the benefits conferred on plaintiffs. *Evansville–Vandenburgh Airport Authority Dist. v. Delta Airlines,* 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972); *American Airlines, Inc. v. Massachusetts Port Authority,* 560 F.2d 1036 (1st Cir.1977); *Raleigh–Durham Airport Authority v. Delta Airlines,* 429 F.Supp. 1069 (D.N.C. 1976); *Southern Airways, Inc. v. City of Atlanta,* 428 F.Supp. 1010 (N.D.Ga.1977).

■ Plaintiffs' fundamental claim is that the Buckley methodology violates the AHTA because it produces rates which are unreasonable. Plaintiffs attack the method on several grounds. Plaintiffs argue that the method is illegal because (1) it results in exorbitant profits for the Airport which far exceed the costs that the plaintiffs impose on the Airport; (2) it considers surplus concession revenues as profit and does not cross credit the surplus to plaintiffs in setting their rates and fees and (3) it discriminates against plaintiffs in favor of general aviation users. The overriding theme to plaintiffs' argument is that the rates and fees are inherently unreasonable since they generate a surplus in excess of $2,000,000 per year and have resulted in a cash surplus on hand in 1989 of over $9,000,000.

Plaintiffs maintain that in order for the Buckley compensatory method to comply with the AHTA, the KCAB must cross credit the concession revenues when establishing plaintiffs' rates and fees. This contention by plaintiff would essentially require the Airport to share the surplus revenues from nonairline users with plaintiffs. In 1973 Congress passed the Airport Development Acceleration Act ("ADAA") Pub.L. 93–44, 49 U.S.C. § 1714(a), (b), to increase federal funding of Airport development. Congress included the AHTA as part of the ADAA. Specifically the AHTA prohibited direct or indirect "head taxes" on airline passengers and overruled the holding in *Evansville–Vandenburgh Airport Authority Dist. v. Delta Airlines, supra,* which permitted airport taxes and levies on persons traveling in "air commerce." Since air travelers were subject to an 8% federal ticket excise tax, Congress intended to prohibit any similar state tax on air travelers. *See* S.Rep. No. 12, 93 Cong., 1st Sess. 1, *reprinted in* 1973 U.S.Code Cong. & Admin.News 1434, 1446. *Aloha Airlines v. Director of Taxation of Hawaii,* 464 U.S. 7, 104 S.Ct. 291, 78 L.Ed.2d 10 (1983); *Salem Transportation Company v. Port Authority of New York and New Jersey,* 611 F.Supp. 254, 257 (S.D.N.Y. 1985).

The AHTA in part provides:

§ 1513(a) No State (political subdivision thereof …) shall levy or collect a tax, fee, head charge, or other charge, directly or indirectly, on persons travelling in air commerce or on the carriage of persons travelling in air commerce

or on the sale of air transportation or on the gross receipts derived therefrom.

§ 1513(b) [N]othing in this section shall prohibit a State (or political subdivision thereof ...) ... from levying or collecting reasonable rental charges, landing fees, and other service charges from aircraft operators for the use of airport facilities.

The plain reading of § 1513(a) applies only to persons or the carriage of persons traveling in air commerce or the sale of air transportation or the gross receipts therefrom. The statute clearly focuses on air commerce. The Federal Aviation Act, 49 U.S.C.App. § 1301(4), (23), and (24) defines the terms: "air commerce," "interstate air commerce," and "interstate air transportation." "Air commerce" refers to "operation or navigation of aircraft"; "interstate air commerce" and "interstate air transportation" refer to "carriage by aircraft of persons or property." The statute simply does not reference nonairline concession activity. Further, § 1513(b) does permit airport authorities to "levy and collect *reasonable* rental charges, landing fees, and other service charges from *aircraft operators* for the use of airport facilities." (Emphasis supplied.) Facially, nonairline concession revenues are not within the scope of the AHTA. Accordingly, the AHTA does not support the plaintiffs insofar as they seek to require the Airport to cross credit nonairline concession revenues to plaintiffs for purposes of establishing their rates and fees. *City and County of Denver v. Continental Air Lines, Inc.,* 712 F.Supp. 834, 837–8 (D.Colo.1989).

Historically large "hub airports" generated sufficient revenues to fund development. The legislative history of the ADAA, of which the AHTA is a part, acknowledged that airports retained and used nonairline concession revenues that exceeded expenses. Congress contemplated that profitable airports would use such funds for local airport expansion and other capital projects. *Id.* at 837. In this regard, the *Denver* Court stated:

The legislative history of the Anti–Head Tax Act reinforces this court's conclusion that Congress did not intend it as a restriction on the collection and use of concession revenues. Nowhere in the legislative history of the Anti–Head Tax Act is there any indication that Congress intended to regulate rates charged to concessionaires, and there is no indication that Congress sought to preclude airport operators from generating surplus revenues from concessionaires to fund airport expansion and development. On the contrary, Congress recognized concession revenues as an important source of airport capital funding since federal government grant money does not finance 100% of any "airport development project."

*Id.* (citations omitted).

Plaintiffs argue that this Court should follow the law as set forth in *Indianapolis Airport v. American Airlines, Inc.,* 733 F.2d 1262 (7th Cir.1984) and require the Airport to cross credit concession revenues when setting plaintiffs' rates and fees. According to the facts, the Indianapolis Airport generated approximately $2.5 million in profits from charges to concessionaires. The *Indianapolis* court found the rates and fees unreasonable. However, only two of the judges based their decision on the AHTA.

Judges Posner and Coffey found that the overall rate structure violated the AHTA because the excessive fees charged concessions amounted to a head tax on the persons using the parking lot and concessions who, for the most part, were airline passengers. The Court set forth two factors which it said supported its decision. First, the Airport had a monopoly on air travel in the region. Apparently the Indianapolis Airport is the only one serviced by major airlines in that part of Indiana. There was no proof presented at trial before this Court on this issue. The Court can take judicial notice that Capitol City Airport in Lansing is served by major airlines and is only about one hour from Grand Rapids. Also, the Kalamazoo Airport, located in the Western part of Michigan is about an hour south of Grand Rapids, and is served by at least one major airline. In light of the lack

of proof and the existence of the Lansing and Kalamazoo Airports, the Court finds that the Airport in Grand Rapids is not in a monopoly situation.

The *Indianapolis* court stated that, in addition to proof of a monopoly, the airlines "must also show that this power is being used to impose unreasonable rates, directly on the airlines or airline passengers, and not on other entities that are neither formal nor actual parties to this case." *Id* at 1267. The Court went on to state:

Here the second critical fact comes into play, which is that the people who use the concessions at the Indianapolis airport are, with rare exceptions, airline passengers. Although some airports adjacent to large cities (the Milwaukee airport for example) have meeting facilities that attract nonpassengers, the Indianapolis airport does not. The parking lot is used by emplaning passengers and by people picking up deplaning passengers. The car rental agencies are used by emplaning and deplaning passengers, and likewise the food stands and newsstands. This means that when the airport charges a rental fee to concessionaires it is as if it were charging a landing fee to the airlines or imposing a head tax on the passengers. If a traveler is willing to pay $140 to fly from Indianapolis to (say) New York, it should be a matter of indifference to him whether he pays $100 for the ticket, $10 in head tax, and $30 for parking; or $120 for the ticket and $20 for parking, with no head tax. What matters to him is the total cost that he must incur to make the flight rather than the form in which the cost is distributed among the various items that he must buy.

.    .    .    .    .

When concession rentals—paid ultimately by the passengers or (in the form of reduced ticket prices) the airlines—that are more than three times the cost that the Authority itself allocates to the concessions are added to the airline user fees that also fall on either the airlines or their passengers, the result is an exaction that is wholly disproportionate to the costs to the airport of serving the airlines and their passengers, and is there-

fore unreasonable under the state and federal statutes.

*Id.* at 1267–68. The Court, therefore, invalidated the rates and fees as unreasonable but did not tell the Indianapolis Airport how to fix reasonable ones.

Judge Flaum concurred with the majority opinion but based his decision on Indiana law. Judge Flaum stated that the AHTA "does not apply to fees charged to concessionaires. The majority opinion thus has expanded the reach of the statute and created regulation of the market system where Congress clearly had no intent to regulate." *Id.* at 1274.

This Court agrees with Judge Flaum's view of the AHTA. In that regard, this Court follows *Denver, supra,* and declines to follow the *Indianapolis* case. Although this case can be factually distinguished since there was no proof presented that the Airport has a monopoly, this Court agrees with both Judge Flaum and the *Denver* court that the AHTA is inapplicable to fees charged to nonairline users of the Airport. Judge Matsch in *Denver, supra,* stated:

Persons affected by the rates, rentals and charges for the restaurants, gift shops, parking lots and rental cars, include persons who are not air passengers. These accessory uses of the airport may be considered amenities for air passengers and convenient for them, but no person traveling to, from or through Stapleton on United or Continental flights is required to park in the parking lot, rent a car, eat at a restaurant or buy a magazine. Those are all individual decisions driven by individual perceptions of need and economic values. That is not the case with respect to the use of the airport's runways, taxiways, and airplane portions of the terminal area. There, the air passenger is captive and her purse is necessarily and directly affected by Denver's charges to the airlines for those uses. Stated differently, Denver's decision to operate concessions at a profit is not an exploitation of airline passengers who have the freedom of choice to use the amenities Denver has provided.

712 F.Supp. at 838–39. Judge Matsch's reasoning is especially applicable at the Kent County International Airport. The Court finds that at trial, even plaintiffs' experts, Professor Horngren and Mr. Dompke, agreed that the Airport is basically an origin and destination airport. That means that most airline passengers using the Airport are either leaving from the Airport on the first leg of their journey or arriving at the Airport as the final destination of their journey. Therefore, if passengers wish to avoid concession prices, they can easily do so because there is no need for long waits at the Airport. If most of the passengers were just passing through the Airport to another destination, they would be a more "captive audience" for the Airport concessionaires. However, even then, the passengers can choose whether to use Airport concessions. The passengers cannot choose whether to use the runway, gates and airline ticket counters, however.

Therefore, the Court holds that the AHTA does not apply to rates and fees charged to nonairline users of the Airport. Accordingly, the Court will not order the Airport to share surplus generated by these users with plaintiffs.

■ The above analysis does not end the Court's review. Although the Court will not require the Airport to cross credit concession revenues when establishing plaintiffs' rates and fees, the Court must review the rates and fees charged plaintiffs and determine whether they are reasonable. The Court finds that, except for the aircraft parking fee, the plaintiffs were charged the break-even costs for the areas they use. The record at trial showed that, in 1987 and 1988, the charges to the airlines equalled 43.3% and 40.6% respectively of the total airport expenses. In addition, the Airport's financial statements disclosed that the payments from the airlines have consistently been at approximately one-third of the total airport operating revenues. The rates and fees charged plaintiffs represented only 1.2% of the airlines' revenues generated at the Airport in 1988. If the Ordinance Rates had been applied, the airlines' payments would have equalled

1.5% of the revenues generated. It is clear to the Court that the Airport is charging plaintiffs only for their share of the operating expenses and is not generating any of its surplus revenues from rates and fees charged plaintiffs. Therefore, the Court finds that the Airport's charges to plaintiffs are reasonable in light of the benefits conferred on plaintiffs in exchange for the landing fees and terminal rental rates.

■ Plaintiffs argue that they should not be charged 100% of CFR expenses. This Court agrees with the *Indianapolis* court that such costs are properly allocable 100% to the airlines. 733 F.2d at 1271. The CFR costs are incurred solely because of the presence of plaintiffs and other commercial airlines at the Airport. If all the concessionaires, general aviation and fixed based operators terminated their tenancies with the Airport, the Airport would still be required to provide CFR. If all the commercial airlines ceased service at the Airport, the Airport would no longer be required to provide CFR. In addition, at trial Dean Nitz, an FAA agent, testified that it was appropriate to charge all CFR costs to the commercial airlines. Therefore, the Court finds that a charge of 100% of CRF to plaintiffs does not violate the AHTA.

■ Plaintiffs also argue that the aircraft parking fees should be eliminated since the airlines overnight their planes at gates which are already charged 100% to the airlines. Defendants argue that plaintiffs' choice to overnight at the gates is a business decision which should not prevent defendants' reimbursement of costs for the parking areas reserved by the Airport for overnight parking. The Court agrees that defendants should be reimbursed for the costs of providing the parking area. However, defendants should not be allowed to make a profit on this charge. The Court considers such a profit to be an indirect head charge and violative of the AHTA. Witnesses for both plaintiffs and defendants stated that the costs for the overnight parking area were $28,000. However, the Airport's financial statements indicate that the Airport received more than $150,000 in overnight parking charges in

1988. The Court finds this fee unreasonable and will require the Airport to recalculate this fee to result in a true break-even charge for aircraft parking.

▮ Finally, plaintiffs argue that the undercharge to general aviation results in discrimination against plaintiffs who are interstate carriers. If the airlines were charged rates which compensated for the shortfall in general aviation fees, this Court might agree with plaintiffs. However, that is not the case. It is clear to the Court that the shortfall from general aviation users is covered by charges to concessionaires and other nonairline users of the Airport. Therefore, plaintiffs' argument must fail.

▮ Defendants argue that, if the rates are found to be reasonable, plaintiffs must pay them the difference between the Prior Rates and the Ordinance Rates from the expiration of the prior leases on January 1, 1987. Michigan law presumes that, where a tenant holds over and the landlord accepts rent, the tenancy is continued on the same terms for another year. *Kokalis v. Whitehurst*, 334 Mich. 477, 480, 54 N.W.2d 628 (1952). However, as in *Kokalis*, no tenancy was created under the circumstances of this case. The facts demonstrate that plaintiffs and defendants attempted to negotiate new leases but failed. That failure resulted in the KCAB imposing new rates by ordinance. These new rates were enacted by ordinance on April 1, 1988. Although these are the same rates originally proposed by defendants at the expiration of the prior leases, the Court finds that they were not a sum certain prior to April 1, 1988. Therefore, the Court will order plaintiffs to pay the KCAB the difference between the amount paid and the Ordinance Rates from April 1, 1988 to the date of the judgment to be entered by the Court with a credit to be given for the excess aircraft parking fee which has been paid. As of the date of that judgment, plaintiffs must pay the KCAB at the ordinance rate as adjusted to conform the aircraft parking fee to the requirements of this opinion.

In conclusion, the Court holds that the AHTA does not require defendants to cross credit nonairline revenues when establishing rates to be charged airlines. Although the Court is troubled by such large surpluses generated by the Airport, it must acknowledge the prudent management which allows the Airport to run efficiently and with foresight thereby avoiding the necessity of seeking extra tax or bond revenues from the citizens of Kent County for expansion or improvement. The Court finds the fees charged plaintiffs to be reasonable except for the overnight parking fee which must be recalculated in accord with allocated costs.

A judgment consistent with this opinion shall issue forthwith.

## JUDGMENT

In accordance with the Court's written opinion dated June 18, 1990;

The Court hereby finds for defendants on all allegations of plaintiffs' second amended complaint except for the allegation that the aircraft parking fee is unreasonable.

The Court further finds for plaintiffs on the allegation that the aircraft parking fee is unreasonable;

The Court further finds for defendants on their counterclaim;

In accordance with the findings of the Court,

IT IS ORDERED that defendants recalculate the aircraft parking fee to recover funds equal to but not greater than the costs of providing the aircraft parking area;

IT IS FURTHER ORDERED that plaintiffs are to pay defendants the difference between the Prior Rates and the Ordinance Rates for the period of time from April 1, 1988 to the date of this Judgment, with an adjustment for the overpayment of the aircraft parking fee;

IT IS FURTHER ORDERED that the plaintiffs must pay the Ordinance Rates

with the recalculation for the aircraft parking fee as of the date of this judgment.

IT IS SO ORDERED.