**NORTHWEST AIRLINES, INC.; Simmons Airlines, Inc.; Piedmont Aviation, Inc.; Comair, Inc.; Midway Airlines, Inc.; USAir, Inc.; American Airlines, Inc.; and United Airlines, Inc., Plaintiffs–Appellants,**

v.

**COUNTY OF KENT, MICHIGAN; the Kent County Board of Aeronautics; and the Kent County Department of Aeronautics, Defendants–Appellees.**

Nos. 90–1811, 90–2117.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 23, 1991.

Decided Feb. 3, 1992.

Rehearing En Banc
Denied April 16, 1992.

Dissent from Denial of Rehearing
En Banc Filed May 7, 1992.

Douglas E. Wagner, Christopher C. Williams, Mark S. Bransdorfer (briefed), Warner, Norcross & Judd, Grand Rapids, Mich., Walter A. Smith, Jr. (argued), Hogan & Hartson, Washington, D.C., Malcolm C. Mallette (briefed), James G. McIntire, Krieg, DeVault, Alexander & Capehart, Indianapolis, Ind., for plaintiffs-appellants.

Richard A. Kay, Mark S. Allard (briefed), Varnum, Riddering, Schmidt & Howlett, W. Fred Hunting, Jr. (argued), briefed, Robert A. Buchanan, Law, Weathers & Richardson, Grand Rapids, Mich., for defendants-appellees.

Before KENNEDY and NELSON, Circuit Judges, and CONTIE, Senior Circuit Judge.

KENNEDY, Circuit Judge.

Northwest, Simmons, Piedmont Aviation, Comair, Midway, USAir, American and United Airlines dispute the landing fees, terminal building rental rates, carrying charges, and crash/fire/rescue charges assessed them at the Kent County International Airport serving Grand Rapids, Michigan. The Airlines also argue that surplus revenue generated by the fees charged non-airline concessions should be cross-credited to reduce the fees charged to the Airlines. For the reasons stated below, we REVERSE and REMAND to the District Court to determine the proper allocation of fees between the Airlines and general aviation in regard to crash, fire and rescue costs. We AFFIRM the District Court's dismissal of the Airlines' claims under the Airport and Airway Improvement Act of 1982 and the Commerce Clause, its finding that the Airlines have no right to be cross-credited for concession revenues, the finding that the allocation of terminal rental fees between the Airlines and concessions were reasonable, and the finding that the method the airport used to assess airside operation fees for general aviation and the Airlines was reasonable.

I.

The Kent County International Airport ("Airport") is operated by the Kent County Aeronautics Board and the Kent County Department of Aeronautics ("defendants"), both departments of Kent County. The County is the owner and landlord of the Airport and its facilities. The Airport was originally financed by the issuance of general obligation bonds which were later retired through a tax levy. The Airport is a relatively small hub airport whose primary passengers consist of people with Western Michigan origins or destinations. The Airport is serviced by Northwest, Simmons, Piedmont Aviation, Comair, Midway, USAir, American and United Airlines ("Airlines").

The accounting methodology used by the Airport views the Airport as the landlord, and all users as tenants. This accounting system, developed by James C. Buckley, is known as the Buckley or compensatory "methodology" and is widely used by airports.[1] The system is designed so that the Airlines are only charged for the land costs, physical facilities and other expenses which can be directly allocated to them. When using this system, the Airport first determines the cost basis of the land and facilities. Next, the usage of all areas is calculated and the various users are assigned rents that reflect their usage level. The costs are primarily divided among three groups: the Airlines, non-airline concessions, and general aviation.[2] These users enter into leases with the Airport which establishes the fees and rates to be charged.

The Airlines and the Airport negotiated and agreed on the fees to be charged through December 31, 1986. In 1986, a new rate study resulted in increased fees and the Airlines and Airport could not reach an agreement. Finally, on March 10, 1988, the airport passed an ordinance which unilaterally increased the fees. On April 1, 1988, this case was filed challenging the ordinance rates and the rates charged subsequent to December 31, 1986.[3] The Airlines specifically dispute the landing fees of 70.21 cents per 1,000 lbs., the terminal building rental rates, the carrying charge, the fact that general aviation was not also

1. *See* Report from James C. Buckley, *Fees for the Use of Public Aircraft Facilities and Rental for Passenger Terminal Premises, for Freight Terminal Premises, for Rentable Buildings, and for Ground Space: Kent County Airport,* (February 1969).

2. The term "general aviation" encompasses corporate aircraft and privately owned aircraft that are not used for transportation of military, public passengers, or cargo. The District Court found that over 160 general aviation craft are based at the Kent County Airport. *Northwest Airlines, Inc. v. County of Kent, Mich.,* 738 F.Supp. 1112, 1114 (W.D.Mich.1990).

3. The Airlines amended their complaint on May 9, 1988 and again on November 9, 1988.

charged based on their costs, and the Airport's allegedly excessive fund balance.

## II.

Prior to the trial in this case, the District Court ruled on cross motions for summary judgment. The District Court held that the Airlines did have a private right of action under the Anti–Head Tax Act ("AHTA") and denied the Airport's motion for summary judgment. It also held, however, that the Airlines had no right of action under the Airport and Airway Improvement Act or the Interstate Commerce Clause of the United States Constitution. We agree with the District Court.

The defendants first claim that the Airlines are precluded from challenging the current rates in federal court under either the AHTA or Airport and Airway Improvement Act of 1982 ("AAIA") because they failed to exhaust their administrative remedies. The defendants argue that the Airlines must first raise any claims with the Secretary of Transportation under the AAIA before any claims may be made in the District Court. In *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Supreme Court established four factors to be used in determining whether Congress intended to create an implied right of action. These factors are:

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted" ... ? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Id.* at 78, 95 S.Ct. at 2088 (quoting *Texas & Pacific Ry. Co. v. Rigsby*, 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916)) (emphasis in original; citations omitted). The

Supreme Court has placed increasing emphasis on the second factor—the intent of Congress. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575–76, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979); *Niagara Frontier Transp. Auth. v. Eastern Airlines Inc.*, 658 F.Supp. 247 (W.D.N.Y.1987).

Several courts have found that the AHTA satisfies all the *Cort* factors and that a private right of action exists. *Interface Group, Inc. v. Massachusetts Port Auth.*, 816 F.2d 9 (1st Cir.1987); *Niagara*, 658 F.Supp. at 247. Most importantly, the intent of Congress to grant a private right of action seems inherent in the language of the statute satisfying the second *Cort* factor. The AHTA expressly prohibits states from levying "a tax, fee, head charge, or other charge, directly or indirectly...." 49 U.S.C.A. App. § 1513(a) (West Supp.1991). As noted by the First Circuit, this statute does not mention the Secretary of Transportation nor an administrative or judicial enforcement scheme like those created in similar statutes. *Interface Group*, 816 F.2d at 16. In addition, the other *Cort* factors are also met. Private enforcement furthers the purposes of the statute by ensuring that airlines will file claims that individuals may lack the time and expenses to pursue. The AHTA also clearly identifies the class to be protected. We find that the Airlines had no duty to exhaust administrative remedies as to the statutory claims made under section 1513.

The Airlines face different administrative requirements under 49 U.S.C.A. App. § 2210, the AAIA. A review of the *Cort* factors indicate that Congress intended that there would be no private right of action under section 2210. The statute provides that assurances must be given to the Secretary of Transportation regarding the reasonable terms and rates of an airport development project. 49 U.S.C.A. App. § 2210 (West 1991); *Interface Group*, 816 F.2d at 15. This provision indicates that Congress intended to establish an administrative enforcement scheme.[4] The AHTA

---

**4.** The Airlines argue that they are entitled to claim the protection of section 2210 despite the

and the AAIA do not cover similar issues or provide similar remedies. The AHTA addresses state taxation of air commerce for which recovery of unreasonable taxation or fees would be the remedy. The AAIA, on the other hand, requires certain assurances to be made prior to approval of an airport development project. Failure to make these assurances would result in denial of the grant. For this reason, all claims against the defendants under the AAIA were properly dismissed for failure to exhaust administrative remedies.

■ Second, the defendants assert that the Airlines are estopped or have waived their rights to object to the methodology and fees adopted by the defendants. They base this argument on the Airlines' failure to protest the fees during the twenty previous years. As support, they point to a December 22, 1983 letter from John Sorensen of United Airlines, then serving as the negotiator for all the Airlines, which they claim acknowledges the reasonableness of the rates. The defendants' argument is without merit.

The complaint filed by the Airlines clearly states that the protested fees were reportedly adopted on March 10, 1988 and became effective on April 1, 1988. The past fees referred to in the complaint are only those fees assessed subsequent to the contract which expired on December 31, 1986. The assessed fees do not represent rates which were agreed upon after negotiation. Rather, they are fees which were charged during the negotiation period. None of the protested fees or the requested remedies involves fees assessed under past contracts. The Airlines are not precluded from bringing a judicial challenge to rates because in the past they agreed to different assessed rates. The rates agreed to in the past are the result of negotiations between the Airlines, the County, and the Airport. *Northwest Airlines, Inc. v. County of Kent, Mich.*, 738 F.Supp. 1112, 1114 (W.D.Mich.1990). Only in 1988, when negotiations were unproductive, were these claims brought.

■ Finally, defendants argue that the Airlines do not have standing to raise issues based on rates, fees or charges to passengers and other non-aeronautical users of the airport. Defendants assert that the Airlines must show a causal connection between the damages they claim and the defendants' acts. *See In Re Air Passenger Computer Reservation Sys.*, 727 F.Supp. 564, 568 (C.D.Cal.1989). While it is clear that section 1513 gives the airlines a private right of action, the private right of action given in the statute to passengers may not be asserted by the airlines. The legislative history of the AHTA recognizes that by banning unreasonable taxes on the carriage of air passengers, the statute also prevents those unreasonable taxes from being passed on to the consumer. *See* S.Rep. No. 12, 93d Cong. 1st Sess., *reprinted in* 1973 U.S.Code Cong. & Admin.News 1434, 1451; *Interface Group*, 816 F.2d at 16. Thus, the airlines ensure fair rates in a situation where the charges may be passed through the airlines to the consumer. Individual consumers in these situations may not contest the charges because of financial or time constraints. However, this reasoning does not apply in cases where the charges are being assessed directly to the passengers or other airport users. In these cases, users feel the direct impact of the charges and many, such as the concessionaire, are capable of asserting the claims. For the above reasons, we find that the Airlines have no standing to assert

language giving responsibility to the Secretary of Labor. They place reliance on *Evansville–Vanderburgh Airport Auth. Dist. v. Delta Airlines*, 405 U.S. 707, 721, 92 S.Ct. 1349, 1357, 31 L.Ed.2d 620 (1972), which applies the predecessor to section 2210 in determining Congressional intent regarding airport fees. *Evansville* involved a suit by the airlines against an airport. The airlines in *Evansville*, protesting the fees being applied by the airport, filed suit claiming that the fees were an unconstitutional burden on interstate commerce. The predecessor to section 2210, 49 U.S.C.A. § 1718(a)(8), was referred to as evidence that Congress did not intend to deny or preempt state or local power to levy charges to defray the cost of an airport. No reference was made as to whether the airlines would have had a private right of action under section 1718.

the claims of the non-airline airport users or passengers.

### III.

 The AHTA prohibits the imposition of any fee on "persons traveling in air commerce or on the carriage of persons traveling in air commerce" which are unreasonable. 49 U.S.C.A. App. § 1513(a) (West Supp.1991). Reasonable fees on "aircraft operators for the use of airport facilities" are allowed.[5] The statute does not provide guidance for determining what constitutes a reasonable fee. The Seventh Circuit, in *Indianapolis Airport Auth. v. American Airlines, Inc.*, 733 F.2d 1262 (7th Cir.1984), held that fees "wholly disproportionate" to the costs of serving the airline and airline passengers were unreasonable. The plaintiffs have the burden of proving that the rates are unreasonable in light of the benefits conferred on them. *Evansville Airport v. Delta Airlines*, 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972); *American Airlines, Inc. v. Massachusetts Port Auth.*, 560 F.2d 1036 (1st Cir.1977). Deference is given to the rates established by the state and administrative agencies as long as they act within a broad range of reasonableness. *Evansville*, 405 U.S. at 712–14, 92 S.Ct. at 1353–54.

### A. Reasonableness of the Rates Charged to Concessions

The Airlines' argument suggests that overall the rates and fees established under the ordinance are inherently unreasonable because they result in a substantial profit for the Airport. The District Court found that the Airport had over $9 million in reserves at the end of 1989. Concessions are all the non-aeronautical users: parking lot, car rentals, restaurants, motels, gift shops, advertising, and food services. The fees charged by the Airport to these concessions generate a surplus of $2 million per year and result in a large reserve. The Airport views this surplus as a "contingency" fee to be used at a later time. The Airlines assert that this profit is prohibited by the AHTA and should properly be used to reduce the charges to the Airlines.

 Non-airline concessions are not within the scope of the AHTA. As noted by the District Court, the statute does not mention concessions. Rather, section 1513(b) permits airports to charge reasonable fees and charges from *aircraft operators*. The Seventh Circuit opinion on which the Airlines rely for their assertions is distinguishable. In *Indianapolis Airport,* the court held that an ordinance was unreasonable which disregarded airport concession revenues when establishing the airline rates and fees. Such a result, wrote Judge Posner, is "wholly disproportionate to the costs to the airport of serving the airlines and their passengers, and is therefore unreasonable...." 733 F.2d at 1268. Judge Posner relied on two factors in *Indianapolis Airport* which distinguish that case from the one now before us. First, the Indianapolis airport serves in a monopoly environment. As judicially noticed by the District Court, Kent County Airport is located less than an hour and a half from two airports serviced by major airlines. This means that the passenger has some role in determining from which airport to travel. Second, the Seventh Circuit required the plaintiffs to prove that the rates imposed directly affected the airline or airline passengers and not other parties not parties to the case. As did the District Court, we find the reasoning articulated by

---

5. The text of section 1513 reads, in pertinent part,

 (a) No State ... shall levy or collect a tax, fee, head charge, or other charge, directly or indirectly, on persons traveling in air commerce or on the carriage of persons traveling in air commerce or on the sale of air transportation or on the gross receipts derived therefrom;....

 (b) ... [N]othing in this section shall prohibit a State ... from the levy or collection of taxes other than those enumerated in subsection (a) of this section, including property taxes, net income taxes, franchise taxes, and sales or use taxes on the sale of goods or services; and nothing in this section shall prohibit a State ... owning or operating an airport from levying or collecting reasonable rental charges, landing fees, and other service charges from aircraft operators for the use of airport facilities.

49 U.S.C.A. App. § 1513 (West Supp.1991).

the Colorado District Court in *City and County of Denver v. Continental Airlines, Inc.*, 712 F.Supp. 834 (D.Col.1989) persuasive:

> Persons affected by the rates, rentals and charges for the restaurants, gift shops, parking lots and rental cars, include persons who are not air passengers. These accessory uses of the airport may be considered amenities for air passengers and convenient for them, but no person traveling to, from or through Stapleton on United or Continental flights is required to park in the parking lot, rent a car, eat at a restaurant or buy a magazine. Those are all individual decisions driven by individual perceptions of need and economic values. That is not the case with respect to the use of the airport's runways, taxiways, and airline portions of the terminal area. There, the air passenger is captive and her purse is necessarily and directly affected by Denver's charges to the airlines for those uses. Stated differently, Denver's decision to operate concessions at a profit is not an exploitation of airline passengers who have the freedom of choice to use the amenities Denver has provided.

712 F.Supp. at 838–39. We find that the AHTA does not apply to charges assessed to non-airline concessions and agree with the District Court that the Airlines may not require the cross-credit of concession revenue surplus against their rates and fees.

B. Allocation of fair share costs to concessions

The Airlines were assessed nearly $2 million in fees for 1988. This figure includes 76% of the costs of the passenger terminal building. The remaining 24% of the costs are allocated to concessions including restaurants, hotel, baggage carts and lockers.[6] The cost allocation is based on floor space occupancy. The Airport asserts that the cost allocation of common space is made in the same proportion as the percentage of terminal space the user occupies exclusively. The Airlines respond that the Airport's

cost allocation is unreasonable in violation of AHTA. The Airlines contend that the 76% allocation results in the Airlines paying for 100% of the public spaces. Appellant's Brief at 29 n. 46.

A fee assessed is reasonable as long as it is based on some fair approximation of the cost of providing the facilities and services, is relevant to the operation of the airport, and is not arbitrary and capricious, but is based on a uniform, fair and practical standard. *See Evansville–Vanderburgh Airport Auth. Dist. v. Delta Airlines*, 405 U.S. 707, 712–14, 92 S.Ct. 1349, 1353–54, 31 L.Ed.2d 620 (1972), *quoting Hendrick v. Maryland*, 235 U.S. 610, 624, 35 S.Ct. 140, 143, 59 L.Ed. 385 (1915); *Massachusetts Port Auth.*, 560 F.2d at 1038. An assessment of costs for the common space need not depend on a district court's estimate of the benefits each renter derives from its customers' use of the common area. Although such a method would be a possible method for assessing costs, there is nothing in the Act that dictates that such a method *must* be used.

There is no support for the Airlines' assertion that they pay for 100% of the "public spaces" cost. The Airlines' expert, Richard Dompke, testified that while 100% of the baggage claim area costs are allocated to the Airlines, the costs of common areas surrounding the restaurant, cocktail lounge, gift shop, and game room, are assigned to all users of the terminal building "on an equitable basis." Dompke also testified that part of concourse A has been designated as a public area, and that for this area, 76% had been charged to the Airlines. R.E. No. 162, pp. 163, 164. The Airport's witness, John F. Brown, stated that the Airlines are not charged at all for the space that is roped off where passengers line up to get their ticket and check in their luggage. The lease signed by the parties indicates that an airline must pay a rental rate based on a square footage basis for the ticket wings, concourse level, holding rooms, lounges, and office space which

6. Some of the concessions, such as telephones and advertising space, are allocated no costs at all.

it occupies. Rental of the baggage claim and tag circulation area is apportioned between the users of these areas. Because there is no support in the record that 100% of the costs associated with all common areas of the terminal building are charged to the Airlines, the Airlines have failed to show that the terminal facility fees assessed to them are unreasonable. We therefore affirm the District Court on this issue.

### C. Allocation of fair share costs to General Aviation

The $2 million in fees for which the Airlines are assessed also reflects airside costs for runways, taxiways, and passenger terminal aprons. The Airport allocates these airside costs to general aviation and the Airlines. General aviation, however, is only assessed 20% of its allocated costs. General aviation should be assessed its full allocation of airside costs. The deliberate decision not to assess general aviation its full cost allocation of airside service costs discriminates against the Airlines in favor of locally owned aircraft. The Seventh Circuit, in *Indianapolis Airport*, held in a similar situation,

> The difference in the Authority's treatment of airlines and private planes—making the former pay for the full costs (and more!) that they impose on the airport, but through inaction, allowing the latter to get away with paying little more than half of the costs they impose—has not been justified. And since flights by private planes are more likely to be intrastate than airline flights are, the effect of leaving the flowage fee unchanged has been to shift some of the costs imposed by local users of the airport to its interstate users, who are, along with many of their customers, non-residents of [the state where the airport is located]. This is just the sort of discrimination Congress wanted to prevent in the Anti–Head–Tax Act.

733 F.2d at 1271. The fact that concession revenues compensate for the underassess-

ment does not justify the discrimination. The concession revenues could be used to purchase improvements or additional equipment that would potentially benefit both the concessions and the Airlines. All income from the airport must ultimately be used for airport maintenance or improvement or for a new facility. Thus, failing to assess general aviation for their total costs reduces the benefits which could accrue to the Airlines from the increased revenue.

### D. Crash/Fire/Rescue Charges to General Aviation.

The landing fees charged to the Airlines increased from 50 cents to 70.21 cents per 1,000 lbs. of aircraft weight in 1988. Approximately 50% of this increase was due to an increase in the costs of crash/fire/rescue ("CFR") services. Provision of these services was extended over the entire 24–hour period as opposed to the 18 hours of service previously provided. The Airlines pay 100% of the CFR costs. General aviation, while receiving these services, is allocated none of the cost. The Airlines contend that these services clearly benefit general aviation, as well as terminal and parking lot tenants, and that the allocation of the CFR costs should reflect this benefit.[7]

 Any airport, in order to receive certification, must maintain CFR facilities if the airport serves air carrier aircraft with more than 30 passenger seats.[8] 49 U.S.C.A. App. § 1432(a) (West Supp.1991). The defendants assert that since the Airport would not be required to maintain CFR facilities if only general aviation aircraft used the facilities, general aviation should not share the burden of paying for the services. This position fails to account for the fact that CFR facilities are provided and maintained and service general aviation. The CFR facilities answer and service non-airline calls and rescues. These services increase the cost of maintaining and providing CFR services. If the CFR only responded to commercial airline rescue calls, then the 100% allocation would be appropriate. Charging the Airlines for 100% of the cost of CFR services where general aviation and concessionaires, such

---

**7.** In fact, one witness testified that most of the CFR runs did not involve air carrier aircraft. Deposition of Robert M. Ross.

**8.** Air carriers aircraft includes only those aircraft which are engaged in

> the carriage by aircraft of persons or property as a common carrier for compensation or

hire or the carriage of mail by aircraft, in commerce....

49 U.S.C.A. App. § 1301(24) (West Supp.1991). *See also* 14 C.F.R. § 139.3 (defining "air carrier aircraft"); 49 U.S.C.A. App. § 1301(3) (West 1976) (defining "air carrier"); 49 U.S.C.A. App. § 1301(10) (West 1976) (defining "air transportation").

as car rental companies, receive a substantial benefit is "unreasonable" under the terms of the AHTA. The fact that the CFR services are initially provided because of regulations requiring the services for commercial airlines does not validate allocating the costs of such services only to those airlines when the service provided is adequate to cover all aircraft which use the Airport.

**E. Amortization of Carrying Charges.**

 The Airport allocated to the Airlines "carrying charges" or amortization fees for assets acquired. The defendants assumed when calculating the carrying charges that the capital assets were acquired with a nonexistent 25 or 30 year mortgage. Such a mortgage results in interest charges in addition to the historical cost. The Airlines argue that such a charge results in the Airport recovering 2½ times the initial cost. The defendants claim that such a charge provides the Airport a reasonable return on its investment and is similar in scope to the interest charged by a financing institution. The interest rate adopted for the carrying charge is 8% and it is applied to useful life of the assets. This rate is reasonable and should not result in a net present value which exceeds the initial cost of the project.

**IV.**

 The Airlines urge that we find any claims which are not unreasonable under the AHTA unreasonable under the laws of the State of Michigan. Since we have found that the defendants failed to allocate the proper costs to general aviation, we address only the issue of surplus revenue from concessions under Michigan law. Michigan law provides, in regard to the fees charged by the operator of a public airport,

> [The] terms, charges, rentals, and fees shall be equal and uniform for the same type of facilities provided, services rendered, or privileges granted with no discrimination between users of the same class for like facilities provided, services rendered, or privileges granted; however, the public shall not be deprived of its rightful, equal and uniform use thereof. Terms, charges, rentals and fees may vary where necessary to provide security and funds for payment of bonds to be issued as authorized for payment of bonds to be improvements to any airport, or to allow for other differing costs of

financing, construction of facilities, or maintenance and operation of the facility. Mich.Stat.Ann. § 10.233(e) [M.C.L.A. § 259.133(e) ] (Callaghan 1981). The Airlines argue that because the fees generated by the concessions generate more than is "necessary" to cover airport costs, they are contrary to state law. The Airlines cite no foundation, either in the language of the statute or in case law, which supports their position. Nothing in the statute suggests that generating revenue through charges to concessions is against Michigan law. Rather, the statute addresses nondiscrimination among similar users and considerations which may be made when setting rates. We find that the Airlines' claims that the Airport's surplus revenue is generated in violation of Michigan law to be without merit.

**V.**

The Airlines also submit that the Airport's fees violate the Commerce Clause because of the burden they place on interstate travel. The Supreme Court in *Evansville* established three tests to determine whether the Commerce Clause had been violated: whether fees discriminate between interstate and intrastate users, whether they approximate each user's receipt of beneficial services, and whether they are excessive in relation to the Airport's actual costs. 405 U.S. at 707, 92 S.Ct. at 1349. The Airport claims that the status of the factual record does not support this claim and that in any event the Commerce Clause is not legally applicable. We find that the District Court, relying on *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982), properly dismissed the Commerce Clause contention in its January 19, 1990 decision.

 The Supreme Court, in *Merrion,* held that courts should only undertake a Commerce Clause review of a tax or regulation if Congress had taken no other action to regulate the area. Here, Congress has established clear guidelines for the fees and rates that may be charged commercial airlines and other public airport users. As the District Court found, where the issue before the court is the reasonableness of the fees under AHTA, the court should only look at the consistency between the fees and Congressional policy. Thus, the District Court's dismissal of the Airlines' Commerce Clause claim was correct. The Airlines contend that the District

Court's decision to dismiss the Commerce Clause claim ignores a recent Eleventh Circuit opinion, *Alamo Rent–A–Car, Inc. v. Sarasota–Manatee Airport Auth.*, 906 F.2d 516 (11th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991). This case however involves a different type of dispute. In *Alamo*, an *off-airport* rental car company protested the imposition of a user fee of 10% of all gross receipts from the rental of cars to passengers picked up at the airport. The AHTA clearly does not cover off-airport rental car companies. Thus, Alamo was not disputing a tax or regulation in an area where Congress had acted and was therefore not barred by *Merrion* from suing under the Commerce Clause.

### VI.

Accordingly, the decision of the District Court is REVERSED and REMANDED in order that the costs associated with CFR services may be properly allocated between the Airlines and general aviation. With regard to the Airlines' claim that the concessions are under-assessed for their associated costs and that the Airlines are entitled to be cross-credited for surplus revenue generated by concession fees, the decision of the District Court is AFFIRMED. The majority of the court also confirms the decision of the District Court with regard to the method used to assess airside operation fees.

CONTIE, Senior Circuit Judge.

I concur in Judge Kennedy's opinion, except for Part III(C), allocation of fair share costs to General Aviation. On this issue, I write for the majority as Judge Nelson and I agree that the method the Airport used to assess airside operation fees for General Aviation and the Airlines was a reasonable method within the meaning of the Act.

In regard to the allocation of other costs, I agree with Judge Kennedy that the allocation of terminal rental costs between the Airlines and the concessions was reasonable, because 100% of these costs was not charged to the Airlines. In regard to crash, fire and rescue charges, I agree with Judge Kennedy that it is unreasonable to allocate 100% of these costs to the Airlines and that a remand to the district court is necessary to determine a proper allocation. Judge Nelson dissents from this position.

I will now deliver the opinion of the court with respect to Part III(C), allocation of fair share costs to General Aviation.

The Airlines argue that the Anti–Head Tax Act, 49 U.S.C. App. § 1513(a), has been violated because the Airport unreasonably charges the Airlines 100% of their airside operations costs for their use of the Airport's runways, taxiways, hangars, and passenger terminal apron, but charges General Aviation (corporate and private aircraft) only 20% of the airside operation costs, which it incurs. The Airlines argue that the Act requires that General Aviation be charged the full amount of its airside operation costs.

I do not agree. Since the shortfall in the costs incurred by General Aviation does not come out of the Airlines' pocket, but is made up instead out of concession revenues, this court has no authority to order that General Aviation must be charged 100% of its airside operation costs. The plain language of § 1513(a) of the Act applies only to persons traveling in "air commerce." The statute thus does not give the federal courts the authority to dictate how an airport should manage its business in regard to corporate and private aircraft or concessions, but indicates that a court may interfere only in regard to the reasonableness of the rates charged to commercial airlines. It is not unreasonable for the Airport to charge the Airlines 100% of their airside operation costs and General Aviation only 20% of its airside operation costs as long as the Airlines are not required to pay for the 80% "loss" the Airport incurs in regard to General Aviation.

In the present case, General Aviation is charged a four-cent-per-gallon fuel flowage fee and a landing fee which raises less than 20% of the landing area costs created by General Aviation. The shortfall incurred by General Aviation is made up out of the surplus revenues generated by the fees paid by the concessions. The Anti–Head Tax Act is limited in scope to the reasonableness of the rates charged to commercial aircraft operators and does not concern the revenues derived from concessions. Therefore, a federal court does not have the authority to state that instead of using concession revenues to make up the shortfall, General Aviation must be charged 100% of its airside operation costs. A discrepancy in a fee vis-a-vis different types of air carriers based on an operational cost is unrelated to the Anti–Head Tax Act's prohibition against charges on "persons traveling in air commerce." *New England Legal Foundation v. Massachusetts Port*

*Authority,* 883 F.2d 157, 170 (1st Cir.1989). Moreover, even if General Aviation were charged 100% of its airside operation costs, the Airport reasonably could continue to charge the Airlines 100% of their airside operation costs. Thus, the demand which the Airlines make would not necessarily bring them any relief.

To reiterate, the Anti–Head Tax Act authorizes the federal courts to intervene in the setting of airports rates and charges only in the limited circumstance where the rates charged to commercial airlines are unreasonable. The decision of the Airport in the present case to charge the Airlines 100% of their airside operation costs, but to charge General Aviation only 20% of its airside operation costs, does not result in discriminatory treatment against the Airlines, because the shortfall from General Aviation is not paid for by the Airlines but is made up out of the surplus concession revenues. This Court is in agreement that the Airlines are not entitled to a cross-credit of concession revenues. Therefore, the Airlines do not have standing to challenge what is done with the concession revenues in regard to General Aviation. The Airlines do not contend that the fees charged them for their airside operations costs are arbitrary or capricious and concede that the fees are based on the actual break-even costs calculated on the basis of aircraft weight and number of landings. Because the fees charged to the Airlines for their airside operations have a reasonable relationship to the actual costs incurred, they are reasonable within the meaning of the Anti–Head Tax Act. The decision of the district court that the method the Airport used to assess airside operations fees was a reasonable method is hereby AFFIRMED.

DAVID A. NELSON, Circuit Judge, concurring in part and dissenting in part.

I would affirm the judgment of the district court in its entirety. I agree with what Judge Contie has written with respect to the issues addressed in Part III(C) of Judge Kennedy's lead opinion (allocation of fair share costs to concessions and general aviation), but I am not persuaded that the airport acted unreasonably in its treatment of the cost of crash/fire/rescue services. Accordingly, I dissent from Section III(D) of the lead opinion and from the portion of the judgment that orders a remand.

In joining Judge Kennedy's opinion on the allocation of costs between the airlines and other users, I wish to add a few words on the treatment of the public spaces in the passenger terminal building. Under 49 U.S.C. App. § 1513(b), the airport is allowed to levy and collect "reasonable" rental charges from aircraft operators. The airport has considerable leeway in determining what is reasonable, and even if the record showed that 100 percent of the amortization and operation and maintenance cost of the public spaces in the terminal was being allocated to the airlines, I would be reluctant to conclude that such an allocation was unreasonable.

It would not be unreasonable, I think, to view airline traffic as the *raison d'être* of the terminal. Professor Ferdinand Levy, a highly qualified economist, testified that "you could cut out all the concessions [through the use of satellite parking and so forth] and you could still have the airport and the airlines." (Trial transcript, pp. 993–94.) And if the fundamental purpose of the terminal is to serve the airlines and their customers, it would not be unreasonable to assign to the airlines the full break-even cost of the terminal's public spaces.

The same logic informs the district court's discussion of the assignment to the airlines of the cost of crash/fire/rescue ("CFR") services:

"Plaintiffs argue that they should not be charged 100% of CFR expenses. This Court agrees with the *Indianapolis* court that such costs are properly allocable 100% to the airlines. 733 F.2d at 1271. The CFR costs are incurred solely because of the presence of plaintiffs and other commercial airlines at the Airport. If all the concessionaires, general aviation and fixed based operators terminated their tenancies with the Airport, the Airport would still be required to provide CFR. If all the commercial airlines ceased service at the Airport, the Airport would no longer be required to provide CFR. In addition, at trial Dean Nitz, an FAA agent, testified that it was appropriate to charge all CFR costs to the commercial airlines. Therefore, the Court finds that a charge of 100% of CFR to plaintiffs does not violate the AHTA." *Northwest Airlines, Inc. v. County of Kent, Michigan,* 738 F.Supp. 1112, 1119 (W.D.Mich.1990).

I agree with this analysis.

The airport's method of allocating CFR costs is not the only acceptable method, to be sure, just as its method of allocating terminal space costs is not the only accept-

able method. Economists and cost accountants recognize a wide variety of different methods for assigning costs within a business that offers multiple services to multiple customers. In the absence of a statutory cost allocation formula, however, the courts have no warrant to require the use of one acceptable method in preference to another. *Colorado Interstate Gas Co. v. Federal Power Commission,* 324 U.S. 581, 589, 65 S.Ct. 829, 833, 89 L.Ed. 1206 (1945). Justice Douglas, who spoke for the Court in *Colorado Interstate Gas,* explained that

> "where as here several classes of services have a common use of the same property difficulties of separation are obvious. Allocation of costs is not a matter for the slide-rule. It involves judgment on a myriad of facts. It has no claim to an exact science." *Id.* (Citation omitted.)

*Cf. National Association of Greeting Card Publishers v. United States Postal Service,* 462 U.S. 810, 825, 103 S.Ct. 2717, 2727, 77 L.Ed.2d 195 (1983), a unanimous opinion where the last three sentences of this passage were quoted with obvious approval.

Rate-making, including the cost-allocation component of rate-making, "is essentially a legislative function." *Colorado Interstate Gas,* 324 U.S. at 589, 65 S.Ct. at 833, citing *Munn v. Illinois,* 94 U.S. 113, 24 L.Ed. 77 (1876). Where, as here, a challenged rate structure rests on essentially legislative judgments that meet the applicable statutory test, it is not appropriate for the courts to substitute their judgment for the judgment of the rate-makers.

### ORDER

April 16, 1992.

Before: KENNEDY and NELSON, Circuit Judges; and CONTIE, Senior Circuit Judge.

The court having received a petition for rehearing en banc, and the petition having been circulated not only to the original panel members but also to all other active judges of this court, and less than a majority of the judges having favored the suggestion, the petition for rehearing has been referred to the original hearing panel.

The panel has further reviewed the petition for rehearing and concludes that the issues raised in the petition were fully considered upon the original submission and decision of the case. Accordingly, the petition is denied.

MERRITT, Chief Judge, dissenting from failure to grant en banc rehearing.

(Filed May 7, 1992)

The majority opinion, as Judge Nelson points out in dissent, creates a direct conflict with the Seventh Circuit on the question of allocating the costs of airport firefighting and rescue services. This is an important issue. Most major airports allocate these costs, which are substantial, to the airlines. The effect of our opinion is to hold invalid the cost allocation system at airports across the country. There is a great need for uniformity here. Before we require the Supreme Court to resolve this conflict in the circuits, we should hear the case *en banc.*

The Seventh Circuit in *Indianapolis Airport v. American Airlines,* 733 F.2d 1262, 1271 (1984), said:

> The first [of the airline's contentions] is that the ordinance should have allocated the costs of firefighting services in proportion to the number of fires experienced by each class of users of the airport's facilities over some reasonable period of time rather than mainly to the airlines. We disagree. The airport has elaborate firefighting facilities not in order to enable it to respond to a grease fire in a hamburger stand or a car fire in the parking lot but to protect the airlines and their passengers should a plane catch on fire in a crash or other accident. Airport costs that would not be avoided if a particular class of users stopped using the airport (*i.e.,* the concessionaires) are not costs imposed on the airport by those users, and therefore are not properly allocable to them. Cf. *Illinois v. ICC,* 722 F.2d 1341, 1346 (7th Cir.1983). Thus the bulk of the firefighting costs are properly allocable to the airlines.

Our Court's opinion takes this authority away from the airports in conflict with this reasoning. This is a seriously mistaken view. As a matter of policy, most regional airports want to keep some general aviation on the field for a variety of reasons. The general aviation fleet, the number of new pilots and other similar statistics are in serious decline. Our court's decision which attempts to control the allocation of costs at such airports will make the matter worse and hasten what is already a very serious problem for the future of aviation.